**Jack D. WILSON and Phyllis J. Wilson, Co–Administrators of the Estate of Kevin S. Wilson, Deceased, and Jack D. Wilson and Phyllis J. Wilson, In Their Own Behalf and On Behalf of the Heirs of Kevin S. Wilson, Plaintiffs,**

v.

**CITY OF CHANUTE, The Board of County Commissioners of The County of Neosho, John Rausch, Michael A. Benard, James R. Cotton, Sam Budreau, and Sheryl Beagley, All in Their Individual and Official Capacities, Defendants.**

No. Civ.A. 97–2496–GTV.

United States District Court, D. Kansas.

Feb. 23, 1999.

Scott E. Giffen, Mission, KS, for Jack D. Wilson and Phyllis J. Wilson.

David S. Brake, Henshall, Pennington & Brake, Chanute, KS, for City of Chanute, John Raush, Michael A. Benard, James R. Cotton and Sam Budreau.

Michael T. Jilka, Wendell F. Cowan, Jr., Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Neosho County Bd. of County Com'rs. and Sheryl Beagley.

### MEMORANDUM AND ORDER

VANBEBBER, Chief Judge.

Plaintiffs Jack and Phyllis Wilson bring this action arising out of the death of their son Kevin Wilson, who died of a drug overdose shortly after being released from the City of Chanute, Kansas, police custody on March 7, 1996. On behalf of their son, plaintiffs assert claims under the Fourth and Fourteenth Amendments, and under state law. The case is before the court on the following motions:

(1) Defendants City of Chanute, John Rausch, Michael A. Benard, James R. Cotton, and Sam Budreau's motion (Doc. 89) for summary judgment; and

(2) Defendants Sheryl Beagley and the Board of County Commissioners of Neosho County's motion (Doc. 91) for summary judgment.

For the reasons set forth below, summary judgment is granted to defendants Sheryl Beagley and Neosho County with respect to the federal law claims. The court declines jurisdiction over the state law claims with respect to Beagley and Neosho County. Summary judgment is denied with respect to the City of Chanute, Rausch, Benard, Cotton, and Budreau.

### I. Summary Judgment Standards

Summary judgment is appropriate if the evidence presented by the parties demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could resolve the issue either way. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is "material" if it is essential to the proper disposition of the claim. *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). The court must consider the record, and all reasonable inferences therefrom, in the light most favorable to the party opposing the motion. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 670–71 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party will not bear the burden of

persuasion at trial, that party "may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific evidence that creates a genuine issue of material fact left for trial. *Id.*

## II. Factual Background

The following facts are either uncontroverted or are based on evidence submitted with the summary judgment papers viewed in a light most favorable to the nonmoving party. Immaterial facts and facts not properly supported by the record are omitted.

On March 4, 1996, Kevin Wilson appeared in Neosho County, Kansas, District Court and pleaded guilty to a felony drug offense. A few days later, Wilson telephoned a friend, Deborah Shields, and asked her to receive a Federal Express package on his behalf. Suspicious of the package's contents, Shields informed the Chanute Police Department of Kevin's request and the police arranged to acquire the package from Shields. The package was inspected and the contents were analyzed at the Missouri Southern State College Regional Crime Laboratory. The results indicated that the substance in the package was cocaine.

At 1:30 p.m. on March 7, 1996, Chanute Police Officer Michael Benard arrested Wilson and took him to the Chanute police station. At that time, Wilson was verbal and communicative and was able to stand and walk without assistance. Both Benard and Detective John Rausch testified in their depositions that, after being taken to the police station to give a statement, Wilson verbally agreed to a search of his residence on the condition that they allow him to accompany them to his home.

At approximately 2:15 p.m., Rausch, Benard, and Wilson arrived at Wilson's home and the officers searched the residence.

Wilson indicated that he needed to use the bathroom and to take his Prozac. Rausch searched the bathroom prior to allowing Wilson to occupy it and found approximately thirty bottles of medicine. Rausch testified in his deposition that he checked to make sure that Wilson's name was on each bottle and that he believed that all were legal prescription medications. He did not inventory the drugs or notice if any were narcotics. The officers allowed Wilson to be in the bathroom unattended. Rausch later told County Attorney Sheryl Beagley that Wilson had taken some medications while they were searching his house. No contraband nor any evidence was found during the search.

Benard and Rausch advised Wilson that he should prepare to be taken into custody. Wilson told Benard that he needed to take his maintenance medications with him. Rausch and Benard accompanied Wilson to the bathroom to get his medications but neither noticed how many bottles of medication Wilson put in his bag and no inventory was taken.

Benard, Rausch, and Wilson returned to the station at approximately 3:10 p.m. and Wilson continued to walk normally and to speak without slurring. Wilson was allowed to keep possession of his bag of medications on the trip back to the police station and he carried the bag into the station. Benard testified in his deposition that he stayed with Wilson in the police department booking area prior to the bond hearing, which was held the same afternoon, and Wilson responded to all of Benard's questions.

During Wilson's bond hearing, Wilson told Judge Timothy Brazil that he had taken only two Valium. Wilson denied that he had taken any other drugs or that he intended to harm himself. Upon further inquiry, however, Wilson divulged that the county hospital had given him some antibiotics and acyclovir (Zovirax) and that he took Prozac every day. Wilson kept possession of his bag of medications throughout the bond hearing.

During the hearing, Wilson appeared lethargic—swaying while he stood up and leaning against a table, with occasionally drooping eyelids and slightly slurred speech. Judge Brazil suggested that Wilson be examined and set Wilson's bond at $10,000.00 cash or surety. Neither Beagley, Rausch, nor Benard requested that Wilson be released on his own recognizance.

Immediately upon Wilson's return to the police station after the bond hearing, Barbara Laver, a records clerk at the police department, noticed Wilson's sickly appearance and asked Rausch if she could call an ambulance. Without explanation, Rausch refused. After the bond hearing, Wilson called an acquaintance, James Goble, in Denver regarding bail money. Goble testified in his deposition that he was able to understand Wilson's speech during the entire conversation. Laver testified in her deposition that, approximately fifteen minutes after Wilson returned from the hearing, he staggered to the drinking fountain, put pills in his mouth, and took a drink of water. Laver immediately told Rausch that Wilson had taken the pills and again suggested that they call an ambulance.

After the bond hearing, Benard kept track of Wilson until Wilson was released from custody. During that time, Benard continued to question Wilson regarding the number of Valium he had taken and Wilson finally admitted that he did not know how many pills he had taken, but that he had taken a handful of them. Rausch, a licensed emergency medical technician, was standing nearby during that conversation. Benard testified that he believed that he should obtain medical assistance for Wilson if his condition worsened. Benard knew that a drug overdose involved a serious risk of harm and might require immediate medical attention. Wilson's condition deteriorated much more rapidly after the hearing. Wilson was drifting in and out of consciousness, was trying to go to sleep, and was "slush-mouthed."

At approximately 4:00 p.m. after Benard told Rausch that Wilson admitted taking a handful of Valium, and asked if they should call an ambulance, Rausch telephoned the County Attorney's Office. Rausch testified in his deposition that he called to suggest that Wilson be released on his own recognizance. At the time, Beagley was at the county law library taking the statement of a witness in another case. In Beagley's absence, Lisa Black, an employee of the county attorney's office, spoke with Rausch. At the same time, Phaedra Wade, Beagley's secretary, contacted Beagley at the law library so that Black and Wade acted as intermediaries between Rausch and Beagley. Wade testified in her deposition that she overheard Black tell Rausch to call an ambulance or take Wilson to the hospital. Wade also testified in her deposition that it was Beagley's suggestion to release Wilson on bond. Rausch testified that he and Beagley never discussed saving medical expenses by releasing Wilson, but William Edwards, a local attorney who was with Beagley in the library, testified in his deposition that Beagley told him that the police were trying to release Wilson to avoid medical expenses. Approximately five minutes later, Officer James Cotton arrived in the booking area and watched Wilson. Cotton observed that Wilson was unable to sit upright in his chair and that he had slurred speech. He testified that he believed Wilson was drunk.

As a result of Rausch's call, Beagley directed Wade to prepare an own recognizance bond, fill out the conditions and the court date, and take it to the police station for Wilson's signature. Beagley testified in her deposition that she instructed Wade to get Wilson's signature before taking the bond form to Judge Brazil because the judge would not approve it without the defendant's signature. Wade arrived at the police station at approximately 4:11 p.m. to get the bond form signed by Wilson. Wade described Wilson's condition as pale and sweaty when she arrived at the police station. Wilson needed assistance

to get out of a chair and to stand at the counter with Wade. Because Wilson was unable to sign the document without assistance, Wade helped him guide his hand. Wade was concerned that the signature was insufficient. Wade therefore waited for Wilson's sister, Nan Lassman, to arrive and requested her signature also.

Benard testified in his deposition that no one suggested to him that he call an ambulance for Wilson. Benard called Lassman to request that she pick up Wilson and informed her that Wilson was being released on his own recognizance, that he was under the influence of Valium, and that he was unable to drive. At approximately 4:20 p.m., Lassman arrived at the police station to pick up Wilson. At that time, Benard told her that Wilson kept changing his answer to how many pills he had taken—two, then four, then a handful. Lassman testified that, when she arrived, Wilson was totally incoherent, he was unable to respond to her questions, and his eyes were rolled back. Lassman further testified that, at that time, Wilson was semi-conscious or unconscious. Lassman did not believe that Wilson needed immediate medical attention because she believed that. the police would have taken care of him if he had. After the bond was signed by Wilson and Lassman, Cotton offered to assist Lassman in taking Wilson home. Benard then said to Wilson, "Come on, Kevin, it's time to go home."

Cotton, Lassman, and Wilson arrived at Wilson's home about four minutes later. Cotton was a licensed EMT employed by Neosho County Hospital. Cotton helped Wilson into his house. Cotton testified that Wilson was conscious at the time. Bill Pennington, Wilson's neighbor, however, witnessed the incident and testified in an affidavit that Wilson appeared unconscious when Cotton was helping him outside. Inside the house, Cotton placed Wilson on his back on the living room floor. After turning on the light, Cotton saw that Wilson's mouth was full of emesis and immediately knew that Wilson had gone into full respiratory and cardiac arrest. Cotton called an ambulance and immedi-

ately began cardiopulmonary resuscitation. The ambulance arrived and took Wilson to the hospital, where he was pronounced dead.

That night after Wilson's death, Kansas Bureau of Investigation agent Tom Williams found a handwritten note in the bathroom of Wilson's home. The note indicated to whom Wilson wanted his property to go and stated, "This is no one's fault I want NO MORE PAIN. Please Understand. I love you all."

Dr. Erik Mitchell conducted the autopsy of Wilson on the night of his death. Dr. Mitchell reported that Wilson died of an acute drug overdose, and that Wilson's system contained propoxyphene (Darvon), diazepam (Valium), loxapine (Loxatine), and fluoxetine (Prozac). Dr. Mitchell testified in his deposition that if Wilson had received medical care while he was still conscious or semi-conscious, he would have had a good chance of survival.

During all relevant times, Rausch was the supervisor of the criminal investigation division and he was the supervisor the day of Wilson's death. Rausch testified in his deposition that he has read the entire Chanute Police Department Manual. According to Rausch, the manual directs officers to monitor an arrestee when the arrestee's behavior appears to be affected by the use of drugs. Rausch also testified that intoxicated persons taken into custody were to be placed in a cell monitored by video and personally checked on a periodic basis. Rausch testified in his deposition that he was familiar with the effects of Valium, and that Valium begins to affect a person within one hour, causes a person to relax, and eventually to sleep. Rausch testified that he never believed that Wilson had taken an overdose because he denied that he was trying to harm himself. Rausch testified in his deposition that he was not aware that, during Wilson's previous incarceration, he had been under a suicide watch. Sheriff Rick Wingate, however, testified in his deposition that, on March 7,

1996, prior to Wilson's arrest, Wingate told Rausch about the previous suicide watch.

During all relevant times, Sam Budreau was the chief of police in Chanute and was responsible for the operation of the Chanute Police Department. He was the final policymaker for developing and implementing policies and procedures for the police department. Rausch reported on Wilson to Budreau in Budreau's office at approximately 4:15 p.m. on March 7, 1996, telling Budreau that Wilson was being released to a family member, that Wilson had told Judge Brazil that he had taken two Valium, and that Wilson's actions were consistent with that statement. Budreau's office is approximately fifty to one hundred feet from the booking area. Budreau testified in his deposition that Rausch did not tell him that Wilson admitted taking a handful of pills. Budreau further testified that Rausch did not tell him that Wilson was unable to walk or speak.

During all relevant times, Sheryl Beagley was the Neosho County Attorney. As part of Beagley's normal practice and procedure, she would obtain the release of defendants under modified bond terms without getting prior approval of the judge. Beagley was the final authority on policies in the Neosho County Attorney's Office. Beagley testified in her deposition that, prior to the events involved in this case, she had received a copy of a letter sent from the Neosho County Sheriff to the Chanute Chief of Police expressing concern regarding the lack of medical care provided to detainees before they were sent to the Neosho County Jail.

### III. Discussion

Plaintiff asserts claims against each police officer in his individual and official capacities, the City of Chanute, the county attorney, in her individual and official capacities, and Neosho County.

### A. Fourth Amendment Claims

Plaintiffs allege that Benard and Rausch violated Wilson's Fourth Amendment right to be free of unreasonable searches. Defendants argue that Wilson consented to the search of his home on the condition that he be allowed to accompany the officers to his house.

■■■■ The Supreme Court has long held that the "touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). When an officer conducts a search without a warrant, a Fourth Amendment violation occurs unless an exception to the warrant requirement applies. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Specht v. Jensen*, 832 F.2d 1516, 1522–23 (10th Cir.1987). Consent to the search is one such exception. *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041; *United States v. Bell*, 892 F.2d 959, 965 (10th Cir.1989). "A consent to search, however, is valid only if voluntary." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994). The government bears the burden to prove that the search was voluntary. *Id.*

■■■ In this case, Benard took Wilson into custody at 1:30 p.m. and brought him to the police station. Benard and Rausch testified that, after giving a statement, Wilson orally consented to a search of his residence on the condition that they allow him to be present during the search. Wilson was lucid at the time that he consented to the search. Benard and Rausch complied with Wilson's conditions for the search by allowing Wilson to accompany them to his residence. Defendants have met their burden of showing a voluntary consent to the search.

■■■■ Plaintiff has offered no evidence to suggest that the consent was coerced or involuntary. Instead, plaintiffs argue that, because Wilson was in custody at the time of the alleged consent, defendants were required to remind Wilson of his *Miranda* rights. The court disagrees. Although the police are required to give certain warnings to a suspect prior to conducting

any custodial interrogation, an officer's request to search does not constitute interrogation under the Fifth Amendment. *McCurdy*, 40 F.3d at 1118; *see also Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (defining interrogation as "words or actions ... that the officers should know are reasonably likely to elicit an incriminating response from the subject"); *United States v. McClellan*, 165 F.3d 535, 543–44 (7th Cir. 1999) (request for consent to search not an interrogation because giving consent is not an incriminating statement). Even if the police did engage in custodial interrogation prior to the request for consent to search, "the request for consent to search can be properly separated from whatever illegal interrogation that might have preceded it, thereby making the consent constitutionally valid." *Id.; see also United States v. Shlater*, 85 F.3d 1251, 1255–56 (7th Cir. 1996) (assertion of *Miranda* rights does not invalidate subsequently received consent to search); *United States v. Knight*, 58 F.3d 393, 397 (8th Cir.1995) (same). Thus, the failure of defendants to advise Wilson of his *Miranda* rights did not invalidate the consent whether or not they conducted a custodial interrogation.

▮ Plaintiffs also argue that because no written consent to search was obtained by the officers, the search was constitutionally infirm. The Constitution does not require that officers procure written consent to search. *See United States v. Lewis*, 24 F.3d 79, 81 (10th Cir.1994) (voluntary oral consent validated search). Plaintiff has failed to offer any evidence to refute the fact that Wilson gave oral consent to the search of his home. Accordingly, summary judgment is granted with respect to plaintiffs' Fourth Amendment claim.[1]

1. Because there can be no liability on the part of a governmental unit in the absence of any constitutional violation by a government official, the city is also entitled to summary judg-

### B. Fourteenth Amendment Claims Against Individual City Defendants

Plaintiffs allege that Rausch, Benard, Cotton, and Budreau violated Wilson's Fourteenth Amendment substantive due process rights through their deliberate indifference to Wilson's serious medical needs resulting from his drug overdose. Defendants argue that they are entitled to qualified immunity.

> Once the defendant has properly raised the defense of qualified immunity in a summary judgment motion, [the court applies] a two-part framework. First the plaintiff must show the defendant's conduct violated a constitutional right; second the plaintiff must show the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right.... In considering whether the plaintiff makes such a showing, we view the evidence in the light most favorable to the plaintiff.

*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir.1997) (citations omitted).

#### 1. Was there a constitutional violation?

"Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir.1994). Thus, the survival of plaintiffs' claim hinges on whether defendants' conduct rose to the level of "deliberate indifference to serious medical needs." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The deliberate indifference standard applies whether the claim is based on Wilson's physical condition, his suicidal mentality, or both. *See Mitchell v.*

ment on this claim. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir.1993).

*Maynard,* 80 F.3d 1433, 1444 (10th Cir. 1996) (physical condition); *Barrie v. Grand County, Utah,* 119 F.3d 862, 866 (10th Cir.1997) (suicidal mentality).

▆ Considering the deliberate indifference standard in the Eighth Amendment context, the United States Supreme Court held that:

> a prison official cannot be found liable ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[I]t is enough that the official acted or failed to act despite knowledge of a substantial risk of serious harm." *Id.* at 842, 114 S.Ct. 1970; *see also Barrie,* 119 F.3d at 868–69 (no claim unless custodian knows of and ignores risk). Whether the official was aware of the risk is a question of fact, which is "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970.

a. Officer Benard

▆ Officer Benard was with Wilson almost the entire time that Wilson was in custody. Benard witnessed Wilson's deterioration from 3:10 p.m. until his departure from the police station shortly after 4:20 p.m. From 1:30 p.m. when Benard took Wilson into custody until 3:10 p.m. when Benard, Rausch, and Wilson returned from searching Wilson's residence, Wilson was able to walk and talk normally, and was responsive to Benard's questions. During the bond hearing, Wilson became lethargic, with drooping eyelids and slurred speech, and he needed to lean against a table to prevent swaying while he stood in the courtroom. Judge Brazil even suggested that Wilson be examined. By 4:00 p.m., Wilson was drifting in and out of consciousness and "slush-mouthed." When Wade arrived at 4:11 p.m., Wilson was pale and sweaty, was unable to sit upright in his chair, and needed assistance to get out of his chair, to stand at the counter, and to sign the bond form. At 4:20 p.m., Wilson was, at best, semi-conscious, totally incoherent, and unresponsive, and his eyes were rolled back.

Benard knew that Wilson had possession of his maintenance medications the entire time that he was in custody. At his residence, Wilson indicated to Benard that Wilson needed to take his Prozac. At the bond hearing and in the presence of Benard and Rausch, Wilson admitted to Judge Brazil that he took Prozac every day. Wilson eventually admitted to Benard that he had taken a handful of pills. Benard thus knew that Wilson's statement during the bond hearing that he had taken only two Valium was a misrepresentation as to how many pills and the type that he had taken. Benard testified that he kept track of Wilson after the bond hearing until he was released from custody. Viewing the facts in the light most favorable to plaintiffs, Benard was aware that, fifteen minutes after the hearing, Wilson ingested several pills at the drinking fountain.

Benard also testified that he knew that a drug overdose involved a serious risk of harm and may require immediate medical attention. Moreover, Benard believed that he should obtain medical assistance for Wilson if his condition worsened after the bond hearing. Nevertheless, Benard did nothing. Viewing the evidence in the light most favorable to plaintiffs, plaintiffs have shown that Benard displayed deliberate indifference to Wilson's serious medical needs.

b. Detective Rausch

Detective Rausch was also with Wilson as his condition deteriorated in the span of just seventy minutes. Viewing the evidence in the light most favorable to plaintiffs, Rausch witnessed or was informed of every event that Benard witnessed.

Moreover, Rausch knew that there were thirty bottles of medication in Wilson's bathroom when he allowed Wilson to be in the room unattended. Rausch knew that the maintenance medications, which Wilson kept in his possession all day, had been taken from the selection in the bathroom. Rausch also admitted to Beagley later that Wilson had taken some medications while they were searching his residence.

Rausch was a licensed medical technician. He knew that Wilson had misrepresented to Judge Brazil the type and number of pills that he had taken, and that Wilson actually had taken a handful of pills. Several persons suggested to Rausch that he should call an ambulance, but he refused to do so. Immediately after Benard told him that Wilson had taken a handful of pills and Benard asked if they should call an ambulance, Rausch called Beagley to arrange for Wilson's release.

Rausch argues that he never believed that Wilson had taken an overdose because Wilson told Judge Brazil that he was not trying to harm himself. Rausch, however, had been told earlier that same day that, during Wilson's previous incarceration, he was under a suicide watch. Rausch also argues that he should not be liable for allowing Wilson to use his own bathroom or to have possession of legal prescription drugs. Those acts are not the basis of liability here, but rather are evidence of Rausch's knowledge that a drug overdose was involved. This is sufficient to create an inference that Rausch knew of the serious risk of harm to Wilson. Viewing the evidence in the light most favorable to plaintiffs, plaintiffs has shown that Rausch displayed deliberate indifference to Wilson's serious medical needs.

c. Officer Cotton

Officer Cotton did not arrive at the police station until approximately 4:05 p.m.,

just fifteen minutes before Lassman arrived to take Wilson home. Cotton testified that he believed that Wilson was drunk. Cotton did not witness Wilson's rapid deterioration—only the results. Viewing the evidence in the light most favorable to plaintiffs, however, Cotton was present when Benard told Lassman that Wilson admitted taking a handful of pills and when Lassman saw Wilson's eyes rolled back. Nevertheless, Cotton did nothing to provide medical assistance to Wilson. Plaintiff has offered evidence sufficient to show that Cotton acted with deliberate indifference to Wilson's medical needs while Wilson was in custody.[2]

d. Chief Budreau

■ "Liability of a supervisor under § 1983 must be predicated on the supervisor's deliberate indifference, rather than mere negligence." *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir.1997). Deliberate indifference is met only if the supervisor knows that he is creating a substantial risk of serious harm. *Id.*

■ Plaintiffs first argue that Police Chief Budreau personally exercised deliberate indifference to Wilson's serious medical needs. The court disagrees. There is no evidence in the record that Budreau was aware of a substantial risk of serious harm to Wilson. Budreau saw Wilson shortly after his arrest when he was lucid. The evidence indicates that just before Wilson was released Rausch reported to Budreau that Wilson had told Judge Brazil that he had taken two Valium, that Wilson's actions were consistent with that statement, and that Wilson was being released to a family member. Budreau testified that he was not aware that Wilson had taken more pills, or that Wilson was unable to walk or speak. Plaintiffs have failed to establish a genuine issue of material fact regarding Budreau's personal in-

---

**2.** The court recognizes that Cotton admirably attempted to save Wilson's life after Wilson was out of custody, but such effort is irrele- vant to whether he was deliberately indifferent to Wilson's medical needs while Wilson was in custody.

volvement and deliberate indifference to Wilson's serious medical needs.

■ Plaintiffs also argue that Budreau's failure to properly train or supervise the other officers constituted deliberate indifference to Wilson's serious medical needs. "[S]upervisor liability requires allegations of personal direction or of actual knowledge and acquiescence." *Woodward v. City of Worland,* 977 F.2d 1392, 1400 (10th Cir.1992). At the time of Wilson's death, the police department manual only instructed officers to monitor a detainee when his behavior appeared to be affected by the use of drugs. Benard testified that he did not know what the written protocol of the police department was concerning medical attention for detainees. Plaintiffs offered nonhearsay evidence of one other arrestee in need of medical care, who was sent directly to the Neosho County Jail from the Chanute police station. Moreover, Beagley testified in her deposition that she received a copy of a letter from the county sheriff to Budreau expressing concern about the city bringing detainees in need of medical attention to the county jail. Plaintiff has offered evidence of actual notice and acquiescence with respect to a practice of denying necessary medical care to detainees. Such evidence is sufficient to establish supervisor liability for Budreau.

### 2. Was the law clearly established at the time of the violation?

■ In light of the court's finding that plaintiff has submitted sufficient evidence to establish the alleged constitutional violations by Benard, Rausch, Cotton, and Budreau, the court must consider whether the specific constitutional right claimed to have been violated was clearly established on March 7, 1996. The Tenth Circuit Court of Appeals has already answered

this question. *See Martin v. Board of County Comm'rs,* 909 F.2d 402, 406 (10th Cir.1990). In *Martin,* the court held that, at least by 1985, it was clearly established in the Tenth Circuit that "pretrial detainees are entitled under the Fourteenth Amendment's Due Process Clause to the same degree of protection regarding medical attention afforded [to] convicted inmates under the Eighth Amendment." *Id.* (citing *Garcia v. Salt Lake County,* 768 F.2d 303, 307 (10th Cir.1985)). The court further stated that, "[p]laintiff has thus identified a clearly established constitutional standard by which [his] inadequate medical attention claim must be judged in the familiar 'deliberate indifference to serious medical needs.'" *Id.* The same standard applies here. On March 7, 1996, the allegedly violated constitutional standard was clearly established in the Tenth Circuit. Summary judgment is denied with respect to the Fourteenth Amendment due process claims against Benard, Rausch, Cotton, and Budreau.[3]

### C. Claims against the City of Chanute[4]

Plaintiff claims that the city is liable for the constitutional violations of its officers in this case. Plaintiff alleges that the denial of medical attention rose to a custom within the Chanute Police Department, and that the city failed to adequately train its employees to provide constitutionally required medical attention.

■ "A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Oklahoma County Bd. of County Comm'rs,* 151 F.3d 1313, 1316 (10th Cir.

---

3. It was also clearly established that supervisor liability would result from "actual knowledge and acquiescence." *See Woodward,* 977 F.2d 1392, 1400 (10th Cir.1992).

4. Here, the court considers claims against the city and against the city employees in their

official capacity. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (official capacity suits are same as suits against government entity itself); *Watson v. City of Kansas City, Kan.,* 857 F.2d 690, 695 (10th Cir.1988) (same).

1998). "[M]unicipal liability based on a policy of inadequate training requires proof of the municipality's 'deliberate indifference' to its inhabitants—i.e., the failure to train must reflect a deliberate or conscious choice by a municipality." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir.1998). Plaintiffs may sufficiently show deliberate indifference by establishing that "the municipality [had] actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." *Id.* "In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." *Id.* at 1307 n. 5.

■ Plaintiff offered evidence that Budreau had received a letter from the Sheriff expressing concern regarding past incidents in which the Chanute Police Department had sent detainees in need of immediate medical attention to the Neosho County Jail. Such evidence is sufficient to show notice to Budreau acting for the city. Plaintiff has offered evidence that despite that notice the city failed to train its officers in handling detainees in need of immediate medical care. Accordingly, summary judgment is denied to the City of Chanute with respect to the Fourteenth Amendment due process claim.

### D. Fourteenth Amendment Claim against County Attorney Sheryl Beagley

Plaintiffs allege that Beagley exercised deliberate indifference to Wilson's serious medical needs by facilitating his release from custody without medical attention. Beagley argues that she is entitled to absolute immunity from suit in her individual capacity because her alleged actions were taken as part of her prosecutorial function. The court agrees.

■ "[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [her] role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Absolute immunity covers prosecutorial acts preliminary to the initiation of a prosecution and prosecutorial acts apart from the courtroom. *Id.* at 272, 113 S.Ct. 2606 (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 n. 33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). Acts in connection with a bail application are part of the initiation and presentation of a prosecution and therefore are shielded by absolute immunity. *Lerwill v. Joslin*, 712 F.2d 435, 438 (10th Cir.1983); *see also Brodnicki v. City of Omaha*, 75 F.3d 1261, 1267–68 (8th Cir.1996); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1149 (2nd Cir. 1995); *Burns v. County of King*, 883 F.2d 819, 823–24 (9th Cir.1989).

■ In this case, after Judge Brazil initially set bail at $10,000 cash or surety bond, Beagley endeavored to change the bond to release Wilson on his own recognizance. Her secretary prepared the bond, took it to the police station, obtained the signatures of Wilson and Lassman, and delivered the form to Judge Brazil. These actions taken in connection with a bail application are within the ambit of absolute immunity.

Plaintiffs argue that Beagley's acts constituted legal advice to the police because Rausch contacted Beagley regarding Wilson's condition and Beagley told him that she would get the bond changed so that Wilson could be released. Absolute immunity has been held inapplicable to legal advice to police during pretrial investigations. *Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 507, 139 L.Ed.2d 471 (1997) (discussing *Burns v. Reed*, 500 U.S. 478, 492–96, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)). In *Burns*, the Supreme Court rejected the notion that "advising the police in the investigative phase of a criminal case is so 'intimately associated with the judicial phase of the criminal process.' that it qualifies for absolute immunity." 500 U.S. at 493, 111 S.Ct. 1934 (quoting

*Imbler,* 424 U.S. at 430, 96 S.Ct. 984). Absolute protection is unavailable in such circumstances because the prosecutor is involved in the investigative role of the police, not in the prosecutorial function. *See Kalina* 118 S.Ct. at 507. To the extent that Beagley gave legal advice, however, the advice concerned her advocacy of bail—not an investigative function—and therefore was intimately associated with the judicial process. *See Lerwill,* 712 F.2d at 438 (advocating bail is part of presentation of a prosecution under *Imbler* ).

Plaintiffs also contend that Beagley's acts were administrative because the acts challenged are the acts of preparing the form and obtaining signatures which led to the release of Wilson. "A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution of for judicial proceedings are not entitled to absolute immunity." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. The court must inquire whether the prosecutor's actions are closely associated with the judicial process. *Burns,* 500 U.S. at 495, 111 S.Ct. 1934. Beagley's acts in preparing the bond form, whether or not administrative, are integral to her advocation of bail and, therefore, to the prosecution.

Beagley is entitled to absolute immunity. Accordingly, summary judgment is granted to Beagley in her individual capacity on all federal claims. Further, the court declines to exercise supplemental jurisdiction over the remaining state law claims against Beagley. *See* 28 U.S.C. § 1367(c)(3) (court may decline to exercise jurisdiction over supplemental state law claims if original jurisdiction claims are dismissed); *Bauchman v. West High School,* 132 F.3d 542, 549 (10th Cir.1997) (court should decline to exercise supplemental jurisdiction over state law claims if federal claims are dismissed before trial),

*cert. denied,* —— U.S. ——, 118 S.Ct. 2370, 141 L.Ed.2d 738 (1998).

## E. Claims against Neosho County[5]

Plaintiffs assert that Neosho County is liable for Beagley's actions as Neosho County Attorney. The county counters that county liability is inappropriate because Beagley's actions at issue in this case were taken on behalf of the state of Kansas, not Neosho County. The court agrees.

■ A prerequisite to local government liability under § 1983 is that the local government's policy caused the constitutional wrong. *McMillian v. Monroe County, Alabama,* 520 U.S. 781, 117 S.Ct. 1734, 1736, 138 L.Ed.2d 1 (1997) (citing *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). The court must therefore identify the officials who have final policymaking authority for the county concerning the actions alleged to have caused the constitutional deprivation. *Id.* Here, as in *McMillian,* there is no doubt regarding who has final policymaking authority with respect to advocating bond terms and conditions, but the issue is whether that authority is exercised on behalf of the state or the county. *See id.* at 1736–37. If Beagley acted on behalf of the state with respect to the conduct at issue in this case, the county is not liable.

■ The court need not address whether the official acts on behalf of the state or county in an "all or nothing" sense, but must determine "whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *Id.* at 1737. The inquiry is dependent on state law. *Id.*

"In Kansas, county district attorneys are officers of the state." *Oltremari v. Kansas Social & Rehabilitative Service,* 871

---

5. Here, the court considers claims against the county and against Beagley in her official capacity. *See Graham,* 473 U.S. at 165, 105 S.Ct. 3099 (official capacity suits are same as suits against government entity itself); *Watson,* 857 F.2d at 695 (same).

F.Supp. 1331, 1347 (D.Kan.1994) (citing *State v. Baker*, 249 Kan. 431, 444, 819 P.2d 1173 (1991); *State v. Berg*, 236 Kan. 562, 567, 694 P.2d 427 (1985)). "The philosophy of this state has always been that a criminal prosecution is a state affair and the control of it is in the public prosecutor." *Berg*, 236 Kan. at 565, 694 P.2d 427 (quoting *State ex rel. Rome v. Fountain*, 234 Kan. 943, 945, 678 P.2d 146 (1984)). "The prosecutor is an officer of the state ... who is charged with seeing that the criminal laws of the state are honestly and impartially administered." *Id.* at 567, 694 P.2d 427.

 Several provisions of the Kansas Code of Criminal Procedure confirm that the county attorney acts on behalf of the state in criminal prosecutions. *See* K.S.A. 19–702 (county attorney has duty to appear and prosecute on behalf of the State); 19–703 (same); 19–711 (in absence, sickness, or disability of county attorney, court may appoint acting county attorney); 19–715 (judges may appoint temporary county attorney for their district); 22–2104 (criminal prosecutions to be brought in the name of the State of Kansas); 22–2202(19) ("prosecuting attorney" defined as one authorized by law to appear on behalf of the State). Plaintiff argues that because the county attorney is paid from the county treasury, she acts on behalf of the county with respect to the issues in this case. The United States Supreme Court, however, has rejected the salary source as the definitive factor in cases involving an individual that makes policy for more than one entity. *See McMillian*, 117 S.Ct. at 1740. The court finds that Beagley was a final policymaker for the state with respect to prosecuting criminal actions in Neosho County. Because Neosho County cannot be held liable for Beagley's actions in this case, summary judgment is granted to Neosho County on the federal claims. The court declines to exercise supplemental jurisdiction over the remaining state law claims against Neosho County. *See* § 1367(c)(3); *Bauchman*, 132 F.3d at 549.

### F. Conspiracy Claim

Plaintiffs assert a § 1983 conspiracy claim against Benard, Rausch, and Beagley. "A § 1983 conspiracy claim may arise when a private actor conspires with state actor to deprive a person of a constitutional right under color of state law ... [or] when a plaintiff does not wish to rely exclusively on § 1985(3) with its requirement of class-based, discriminatory animus ..., but could prove a conspiracy to deprive the plaintiff of civil rights under color of state law." *Dixon v. City of Lawton, Okl.*, 898 F.2d 1443, 1449 n. 6 (10th Cir.1990). "Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy." *Id.*

As previously stated, Beagley is entitled to absolute immunity from liability under § 1983 and therefore the conspiracy claim is dismissed with respect to her. *See Dennis v. Sparks*, 449 U.S. 24, 26–27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (absolute immunity protects regardless of conspiracy); *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir.1994) (absolute immunity covers conspiracy claim); *Norton v. Liddel*, 620 F.2d 1375, 1378–81 (10th Cir.1980) (prosecutor absolutely immune from conspiracy claim). Benard and Rausch, however, do not share the shield of Beagley's prosecutorial immunity. *See Norton*, 620 F.2d at 1382.

 Defendants argue that there is insufficient evidence for a reasonable jury to conclude that Benard, Rausch, and Beagley conspired to deny Wilson his constitutional rights. The court disagrees. The evidence of communication between Benard and Rausch, and Rausch and Beagley is sufficient to create an inference that the three had agreed to deprive Wilson of his substantive due process rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 155, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (presence of officer and sequence of events that followed sufficient to infer conspira-

cy). Accordingly, summary judgment is granted to Beagley with respect to the conspiracy claim, and denied to Benard and Rausch.

IT IS, THEREFORE, BY THE COURT ORDERED that defendants City of Chanute, Michael A. Benard, John Rausch, James R. Cotton, and Sam Budreau's motion (Doc. 89) for summary judgment is granted with respect to plaintiffs' Fourth Amendment claim against Michael Benard and John Rausch. The motion is denied in all other respects.

IT IS FURTHER ORDERED that defendants Sheryl Beagley and Board of County Commissioners of Neosho County's motion (Doc. 91) for summary judgment is granted with respect to all of the federal claims. The court dismisses without prejudice the remaining state law claims against Beagley and Neosho County.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**