**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Stephen L. SHLATER, Defendant–**
**Appellant.**

No. 95–1964.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 11, 1996.

Decided June 5, 1996.

---

David H. Miller, Andrew Baker (argued), Office of the U.S. Atty., Fort Wayne, IN, for plaintiff-appellee.

Harold W. Myers, Wyss, McNellis, Riebenack & Myers, Fort Wayne, IN, Kenneth M. Waterman (argued), Fort Wayne, IN, for defendant-appellant.

Before ESCHBACH, COFFEY and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

On December 15, 1993, a federal grand jury indicted Stephen L. Shlater for extortion, in violation of 18 U.S.C. § 1951. Shlater entered a plea of not guilty and was found guilty of the crime charged before a jury. On April 13, 1995, the district court sentenced Shlater to 48 months' imprisonment to be followed by three years of supervised release and 150 hours of community service. The court also imposed a $50 special assessment fee and mandated mental health counseling. Shlater appeals his conviction and sentence. We AFFIRM.

## I. BACKGROUND

On November 20, 1993, employees at Scott's Food Store in the Pine Valley Shopping Mall of Fort Wayne, Indiana received a typewritten extortion note. The note contained a threat to detonate explosive devices planted at other Scott's stores unless $150,000 was delivered to the extortionists.[1] The note instructed that two employees of Scott's Food Stores must bring $150,000 to a local gas station at 9 PM that evening and wait at a designated pay phone there for further instructions. The employees notified the Allen County Police Department. The store was evacuated and several managers and employees were placed in protective custody at a nearby hotel.

An undercover police team (consisting of a male and female officer, Nicholas Litwinko and Michele Waldron, posing as the store manager and female employee required by the note) arrived at the gas station in an unmarked van at 9 PM, the time specified in the note, and waited at the designated pay phone. A third officer, Brian Gore, hid covertly in the van. The officers carried a duffel bag stuffed with Scott's coupons to represent the money. The undercover officers received a call at the pay phone; the caller instructed them to proceed to another pay phone where they would find a written note. The officers followed the caller's instructions and found the note, directing them to another note located in a local state park, which led them in turn to a secluded lane in the woods where they were supposed to drop off the money.

Officer Waldron dropped off the duffel bag at the specified location, while Officer Gore slipped out of the vehicle and concealed himself nearby. Waldron and Litwinko drove off in the van; thirty seconds later an individual dressed in army fatigues and a face mask emerged from the woods and picked up the duffel bag. Announcing that he was a police officer, Officer Gore stepped forward from his hiding place and confronted the individual who immediately dropped the bag and raised his hands in the air and said: "Don't hurt me. They're making me do this."

Officer Gore instructed the individual, who turned out to be Stephen Shlater, the defendant, to lie prone on the ground. Shlater complied. As Officer Gore handcuffed him, the defendant repeatedly stated that "they're making me do this." Shlater then explained to Officer Gore that a letter in the dresser drawer of his bedroom could prove his innocence and invited the officer to search his

---

1. The note, in its entirety, reads:
   Scotts,
   Three explosive devices have been located at various locations of your employees or relatives of your upper management. These are not necessarily employees from this store. We picked different stores in your operational area. We want 150,000 in 50's, 20's, and 10's. You will have the manager of this store and one of his female employees deliver the money to us in a large gym bag. They need to be at the Speedway gas station, located at Dupont and I–69 by 9:00 pm tonite. They will wait at the outside phone for further instructions. Now, we have photographed your employees, so no tricks. They will be observed during different points of the delivery. We insure that no harm will come to them as long as instructions are followed. Make sure

that they have a flashlight so that they can find materials along the way. Now, Mr. Wright, we hope that you understand that any attempts by you to prevent the payment, will result in certain loss of life. This is not a threat, its [sic] a promise. Just simply follow instructions, and we guarantee no one will be hurt. We have also prepared statements to the news media, in case you decide to do something stupid. We are very well armed in case of intervention by the authorities. Please understand that we will detonate, and use you as a future example if we have to. After the money is delivered we will remove the explosive devices, if no attempts are made to obstruct us. Remember have your people wait at the phone until we contact them. Make sure they do not have any communication devices in [the] vehicle.

home and find it. Officer Gore called his depot for back-up units, and they arrived shortly thereafter.

The officers took Shlater in custody and conveyed him to the local police station. From this point on, all interactions between the police and Shlater were recorded on videotape.[2] The police removed Shlater's handcuffs and confirmed his identification and home address. Before asking Shlater any questions regarding the events of the evening, Officer Roy Stevens inquired of Shlater whether he understood English and was literate. The officer then explained to Shlater his constitutional rights, including the right to remain silent and the right to have a lawyer present while being interviewed or to terminate the interview at any time. Shlater read over a form describing these rights and signed it, expressing that he understood his rights. At this time, Shlater stated that he wished to consult with an attorney before answering any further questions. The officers stopped interrogating Shlater about the events of the evening.

The officers then reminded Shlater of his previous requests of Officer Gore, inviting the police to search his home and find the exculpatory note. At that point, the defendant immediately told the officers, "That's no problem whatsoever," but warned the officers to take care of his dog that was locked in the garage. However, before allowing Shlater to consent to the search, Officer Stevens made sure that Shlater understood his constitutional rights. He explained to Shlater that the police could not search his home without a search warrant unless Shlater consented to the search. He also explained to Shlater that he had the right to refuse to consent to the search and had the right to consult with an attorney before granting the officers consent to search. Shlater stated that he understood his rights and voluntarily consented to the search of his home, repeat-

ing that "I don't have any problem with searching it." Shlater also signed a written form, confirming that his consent was freely given and authorizing the police to remove any items of evidence that the officers deemed relevant to the investigation. Furthermore, while at the police station, Shlater asked the officers to unplug his coffee pot which he had accidently left on that evening, further reflecting Shlater's voluntary consent (or even encouragement) to the search.

Shlater willingly accompanied the police officers to his home where they conducted a search of his dwelling in his presence. At no time did the defendant object to the officers' presence or to the search. The officers took a number of items from the house, including a typewriter, the coercive letter the defendant told them he had received, and a crumpled draft of a note similar to that found at Scott's Food Stores that evening.[3]

On December 15, 1994, a federal grand jury indicted Shlater for extortion in violation of 18 U.S.C. § 1951. On December 21, Shlater's attorney filed a motion for judicial determination of the defendant's mental competency to stand trial, pursuant to 18 U.S.C. § 4241. The district court granted the motion and deferred Shlater's arraignment pending the results of a psychiatric examination. Dr. Jay Fawver, a local psychiatrist, performed the examination and submitted a sealed report to the court. After a hearing in March 1994, the district court determined that Shlater was mentally competent to stand trial. Shlater was then arraigned and filed a plea of not guilty, informing the court and the government that he intended to rely upon the defense of insanity.

The government filed a motion for a pretrial psychiatric examination pursuant to 18 U.S.C. § 4242, which was granted by the district court. In September 1994, Shlater was transferred to Federal Correctional In-

---

**2.** A copy of the videotape is part of the record on appeal.

**3.** An FBI laboratory determined that the typewriter used to type the extortion note delivered to Scott's was identical to the typewriter used to type the threatening letter allegedly received by Shlater. Shlater's allegedly threatening letter provides:

Mr. Shlater, We need you to collect something for us. You will do what we request or we will cause harm to your son's family on Thaxton Street. Be at the public phone located at Marathon Station at Dupont and Leo Road at 6:00 p.m. tonite. We will give you your instructions at that time. Do anything stupid and you put your family in great danger.

stitution at Butner, North Carolina for evaluation by federal psychiatrists. In October 1994, Shlater filed a motion to suppress the evidence found at Shlater's home. After an evidentiary hearing in December 1994, the district court denied Shlater's suppression motion, ruling that Shlater had voluntarily consented to the search of his home. A jury trial commenced in January of 1995.

At trial, Shlater entered a plea of not guilty by reason of insanity.[4] To that end, Shlater's father and brother testified that Shlater had acted strangely at Thanksgiving three weeks before the extortion incident, appearing preoccupied and talking to himself. Dr. Larry M. Davis, a psychiatrist, testified on behalf of Shlater as an expert witness under Federal Rule of Evidence 702. Dr. Davis stated that in his opinion Shlater, on the date of the extortion, was suffering from a "severe" delusional disorder that affected his ability to distinguish right from wrong.

Shlater also sought to admit the testimony of a second psychiatrist, Dr. Fawver.[5] The trial court held a hearing outside the presence of the jury to determine the admissibility of Dr. Fawver's testimony. During the hearing, Dr. Fawver testified that Shlater suffered from a "mild to moderate" delusional disorder and had some paranoid personality traits. Dr. Fawver went on to state that Shlater "very much understood what he was doing at the time was wrong, so by definition he wasn't insane as I understand it as a psychiatrist." The trial judge excluded Dr. Fawver's testimony on the grounds that it was immaterial to Shlater's defense of insanity because the statutory definition of insanity required a "severe" mental condition that affects the individual's capacity to distinguish right from wrong; Dr. Fawver, however, testified that the defendant suffered only a mild to moderate mental disorder and was capable of distinguishing right from wrong.

Edward Landis, a clinical psychologist, testified for the government.[6] Landis examined Shlater at the Federal Correctional Institution in Butner, North Carolina. Landis stated that in his belief, Shlater did not suffer from a psychological illness or delusional disorder. Dr. Ralph Newman, staff psychiatrist at the Federal Correctional Institution, also testified that he personally evaluated Shlater and determined that Shlater was not suffering from a mental disorder.

The jury rejected the defendant's plea of not guilty by reason of insanity and found him guilty as charged.

## II. DISCUSSION

### A. Seizure of the Letter

Shlater argues that the district court erred in denying his motion to suppress the evidence discovered by the police in his home. According to Shlater, the police obtained his consent to search *after* he had affirmatively requested an attorney pursuant to his Fifth Amendment rights under *Miranda.* The district court, relying on the videotape as well as the testimony of the officers at the scene, ruled that Shlater's consent to the search of his home was voluntarily and freely given and did not violate any of Shlater's constitutional rights.

"Consent searches are valid only if the consent was freely and voluntarily given. The question of whether a consent was voluntary, as opposed to the product of duress or coercion, is a question of fact from the totality of the circumstances." *United States v. Duran,* 957 F.2d 499, 502 (7th Cir.1992). "We will not reverse a district court's finding on this issue unless clearly erroneous." *Id.*

In *Miranda v. Arizona,* the Supreme Court held that before the police can initiate

---

4. Title 18 U.S.C. § 17(a) provides, with emphasis added:

   It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

5. Dr. Fawver was originally appointed by the district court to examine Shlater in order to determine whether he was mentally competent to stand trial.

6. For purposes of the insanity defense, the defendant's mental condition may be evaluated by either psychiatric or psychological examination. *See* 18 U.S.C. § 4242(a).

custodial interrogation of a defendant, they must advise the defendant of certain rights, including but not limited to the right to remain silent and the right to counsel. Once an accused asks to be represented by counsel he "is not subject to further *interrogation* by the authorities until counsel has been made available to him. . . ." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) (emphasis added). However, *Miranda* only applies to the "custodial interrogation" of a defendant. In *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980), the Supreme Court defined "interrogation" to include "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."

■ Shlater argues that the police request to search was reasonably likely to elicit an incriminating response because the police believed incriminating evidence could be found at Shlater's home. We disagree. First, the defendant told the police at the time of his apprehension that he had been coerced by others and that a letter in his dresser drawer at home would exonerate him. Brian Gore, the arresting officer, testified that Shlater repeated to him several times at the scene of his arrest that "they made me do it" and told him of the specific location where the evidence of the "others" could be found. Second and more importantly, we have held that a consent to search is not an interrogation within the meaning of *Miranda.* *United States v. Saadeh,* 61 F.3d 510, 515 (7th Cir.1995); *see also United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir. 1993) ("We have held that a consent to search is not a self-incriminating statement, and therefore, a request to search does not amount to interrogation. This view comports with the view taken by every court of appeals to have addressed the issue."). Thus we hold that the consent to search was not a custodial interrogation triggering the previously invoked *Miranda* right to counsel.

■ Shlater accompanied the police to his home and at no time did he make any objection to the search. Indeed, it is clear from the videotape that the defendant specif-

ically understood that he had a right to consult counsel concerning the search of his home, but he waived that right (both orally and in writing) and consented to the search. Even though Shlater stated that he wished to have counsel present for any interrogation regarding the specific events of the evening, the law provides that a request for counsel during the *interrogation* does not apply to the subsequent request for a consent to search. *United States v. LaGrone,* 43 F.3d 332, 336 (7th Cir.1994) ("[t]he Supreme Court has held that a defendant's invocation of his right to counsel for one purpose is not automatically an invocation of his right to counsel for other purposes.") (citing *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). Having had his right to counsel concerning the search of his home explained to him, the record makes clear that the defendant waived that right and encouraged the police to search his home. *See United States v. Baker,* 78 F.3d 1241, 1245 (7th Cir.1996) (noting that a consent to search is voluntary and constitutional even where a defendant is not told of his right to counsel).

## B. Exclusion of Psychiatrist's Testimony

The defendant contends that the district court abused its discretion in excluding the testimony of Dr. Fawver. According to Shlater, Dr. Fawver's proffered testimony that the defendant Shlater suffered from a mild to moderate delusional disorder was relevant to the issue of the defendant's insanity.

Rule 702 of the Federal Rules of Evidence provides, with emphasis added:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or *to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ However, not all expert testimony is admissible; the evidence must be relevant to a fact in issue, and the district court retains the discretion to make that determination. *United States v. Sinclair,* 74 F.3d 753, 758 (7th Cir.1996); *United States v. Anderson,* 61

F.3d 1290, 1297 (7th Cir.1995). This rule applies to the relevance of expert testimony concerning a defendant's sanity. *United States v. Davis*, 772 F.2d 1339, 1344 (7th Cir.1985).

▪ "An appellate reversal of a decision to limit an expert's testimony requires more than bare arguments that the expert is qualified and his testimony is relevant. Indeed the abuse of discretion standard requires the challenging party to show that 'no reasonable person would have agreed with the district court['s ruling].'" *Matter of Sheridan*, 57 F.3d 627, 635 (7th Cir.1995) (quoting *Holmes v. Elgin, Joliet & Eastern R. Co.*, 18 F.3d 1393, 1397 (7th Cir.1994)).

▪ We have described the issue of insanity as follows:

> Insanity, for our purposes, is a legal term. We do not ask whether [the defendant] is insane by psychiatric or psychological standards. Rather we ask only whether [the defendant] has established insanity as defined by the Legal Insanity Defense Reform Act (the "Act"). 18 U.S.C. § 17. Under that Act, [the defendant] can establish the affirmative defense of legal insanity only if he proves two facts by clear and convincing evidence. 18 U.S.C. § 17. First, [the defendant] must prove that he suffered from a severe mental disease or defect. Proof that he had a mental disorder is not enough. The Act requires that the mental disorder be *severe*. *United States v. Salava*, 978 F.2d 320, 322 (7th Cir.1992). Second, if [the defendant] proves this first element, the Act requires that he prove that his severe mental disorder rendered him unable at the time of the crime to appreciate the nature and quality or the wrongfulness of his acts. *Id.*

*United States v. Reed*, 997 F.2d 332, 334 (7th Cir.1993).

▪ In Shlater's case, the fact in issue was whether the defendant, at the time of the extortion incident, suffered from a *severe* mental disorder that affected his ability to distinguish right from wrong. Dr. Fawver testified that Shlater suffered a mild to moderate personality disorder. The district court excluded the testimony because the federal statute and caselaw defining insanity require that a defendant suffer from a "severe" mental disorder. The court concluded that it "would not permit a medical opinion ... that didn't fall within the parameters of the statute." Although Dr. Fawver's testimony that Shlater suffered a mild to moderate mental disorder was relevant in a general sense to the defendant's mental state, the Legal Insanity Defense Reform Act is clear that the defense of insanity requires that the defendant suffer a "severe" mental disorder. *See Reed*, 997 F.2d at 334. Had Dr. Fawver testified, his testimony would have served to confuse the jury as to the requisite mental state of severe mental disorder required under the federal statute for criminal insanity. The trial judge did allow the defendant to present a psychiatrist, Dr. Davis, who testified that Shlater had a severe mental disorder; thus, the trial judge did not clearly abuse his discretion in excluding the testimony of Dr. Fawver.

## C. Sentencing

The district court calculated Shlater's guideline imprisonment range to be 41 to 51 months. The judge sentenced Shlater to 48 months' imprisonment. Shlater now argues that the sentencing court erred in failing to depart downwards from the guideline range to account for Shlater's exemplary military and employment record.

We have held that under guidelines section 5H1.6, "a district court may depart from an applicable guidelines range once it finds that a defendant's family ties and responsibilities or community ties are so unusual that they may be characterized as extraordinary." *United States v. Canoy*, 38 F.3d 893, 906 (7th Cir.1994). A major in the Indiana National Guard Reserves, Shlater argues that his twenty-five year military record and twenty-eight year employment record are extraordinary, warranting departure.

▪ By statutory command our review of sentencing is limited to cases in which a sentence was (1) "imposed in violation of law," (2) "imposed as a result of an incorrect application of the sentencing guidelines," (3) "outside the applicable guideline range," or (4) "unreasonable." 18 U.S.C. § 3742(e), (f); *United States v. Prevatte*, 66 F.3d 840, 843 (7th Cir.1995). As a consequence, "we lack jurisdiction to review a

district court's discretionary rejection of a downward departure from a sentence within the applicable guideline range." *United States v. Yahne*, 64 F.3d 1091, 1094 (7th Cir.1995). *See United States v. Blackwell*, 49 F.3d 1232, 1241 (7th Cir.1995); *United States v. Burrows*, 48 F.3d 1011, 1019 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2632, 132 L.Ed.2d 872 (1995). "However, if the district court's denial of a downward departure is based on a conclusion that it lacked authority to depart, that decision is a legal conclusion over which we have appellate jurisdiction." *Yahne*, 64 F.3d at 1094 (citing *Canoy*, 38 F.3d at 903).

In Shlater's case, his sentence was within the applicable guideline range. Thus, we are without jurisdiction to review Shlater's sentence. *See United States v. Solis*, 923 F.2d 548, 551 (7th Cir.1991).

## III. CONCLUSION

The conviction and sentence of Stephen Shlater are

AFFIRMED.