In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-3388, 04-1469, 05-4798 & 05-4799

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MIGUEL BUSTAMANTE, RAPHAEL PENA,
ABRAHAM ESTREMERA, and STEVE LISCANO,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 719—**James F. Holderman**, *Chief Judge.*

ARGUED MAY 3, 2007—DECIDED JULY 16, 2007

Before EASTERBROOK, *Chief Judge*, and FLAUM and
RIPPLE, *Circuit Judges*.

FLAUM, *Circuit Judge*. On November 20, 2002, a grand
jury indicted Miguel Bustamante, Raphael Pena, Abraham
Estremera, and Steve Liscano for a number of crimes
related to a drug conspiracy in Aurora, Illinois. All four
defendants were charged with knowingly participating
in a conspiracy to distribute and possess with intent to
distribute cocaine, in violation of 21 U.S.C. §§ 841(a) &
846. Estremera and Pena were also charged with being
felons in possession of firearms, in violation of 18 U.S.C.
§ 922(g), and Bustamante was charged with possessing
with intent to distribute cocaine, in violation of 21 U.S.C.
§ 841(a)(1); being a felon in possession of a firearm, in

violation of 18 U.S.C. § 922(g); and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Shortly after he was charged, Bustamante filed a motion to suppress evidence that police found in his vehicle. The district court denied the motion, and Bustamante entered a conditional guilty plea, reserving the right to appeal the district court's ruling. The other defendants went to trial. A jury found them guilty on all charges and determined that the conspiracy involved more than five kilograms of cocaine. Bustamante appeals the district court's denial of his motion to suppress, and the other three defendants appeal their convictions and sentences.

For the following reasons, we affirm Liscano's, Estremera's, and Pena's convictions and Liscano's and Estremera's sentences. We also affirm the district court's ruling on Bustamante's motion to suppress. We vacate Pena's sentence, however, and remand for resentencing.

## I. Background

Between June 2000 and July 2002, members of the Latin Kings street gang operated a drug conspiracy in Aurora, Illinois. The conspiracy's primary drug distributor was a man named Juan Corral, whose ultimate downfall was a penchant for discussing drug deals over the phone. After the government recorded more than a thousand phone calls between Corral and his drug associates, a federal grand jury indicted Corral, Liscano, Estremera, Pena, Bustamante, and six others, alleging that they conspired to distribute drugs and possessed illegal weapons in the process.

In May 2003, Corral pleaded guilty and agreed to testify against his alleged co-conspirators in exchange for leniency. Liscano, Estremera, and Pena went to trial, and the government's evidence primarily consisted of Corral's

testimony and the recorded telephone conversations between Corral and each defendant. That evidence, recited in the light most favorable to the prosecution, is summarized in relevant part below.

### A.  Liscano

Liscano, a member of the Latin Kings, met Corral in 1992. Between September 2001 and June 2002, Corral fronted Liscano at least sixteen kilograms of cocaine during monthly drug deals. On May 13, 2002, Liscano called Corral to advise him that a police officer was checking Liscano's license plate and that the officer might have seen them complete an earlier drug transaction. On May 17, 2002, Liscano called Corral and told him that federal law enforcement officers were at a restaurant near Corral's residence and that Corral should warn other Latin King members, including Estremera, about the possibility of a raid. Liscano and Corral had other conversations in which they discussed in coded language when Corral would be supplied with drugs.

The district court gave Liscano a mandatory sentence of life in prison on the conspiracy charge. The sentence was based on Liscano's conviction for distributing more than five kilograms of cocaine and his two prior felony drug convictions. *See* 21 U.S.C. § 841(b)(1)(A).

### B.  Estremera

Estremera, also a Latin King, met Corral in 1988 or 1989. From February 2002 to June 2002, Corral fronted Estremera cocaine once every three weeks in an amount totaling approximately seven kilograms. Corral would either personally deliver the cocaine to Estremera or leave it in Estremera's garage, which Corral also used to store cocaine for other customers.

The government recorded numerous phone calls in which Estremera spoke with Corral about drug dealing. He asked when Corral would be supplied, informed Corral when he had money to pay him, asked if it was okay to use other suppliers when Corral was out of drugs, and spoke about Corral's use of his garage. On one occasion, Estremera and Corral discussed how the police might have spotted them during a transaction, and on yet another occasion, Corral told Estremera that he had seen police near Corral's home.

On July 24, 2002, police arrested Estremera in his home and recovered a small scale, over $13,000 in cash, and a gun. After advising Estremera of his *Miranda* rights, police played for him a number of recorded telephone conversations between him and Corral. Estremera admitted that the voice on the recordings was his and said that he was willing to accept responsibility for his actions.

At sentencing, the district court found that Estremera was responsible for more than 150 kilograms of cocaine and that his total offense level was 40. With a criminal history category of VI, his Guidelines range on the conspiracy charge was 360 months to life. Estremera argued that the bulk of his prior criminal convictions occurred more than ten years before his conviction in this case and that he now realized that his relationship with the Latin Kings was "illusory and tenuous." He also pointed out that he had been attempting to better himself by taking GED and Bible study classes in prison and that a life sentence would take away any incentive for him to continue engaging in such activities.

The district court rejected Estremera's argument and sentenced him to life in prison on the conspiracy charge and a concurrent 120-month sentence on the felon in possession charge. The court explained that it had to consider the factors outlined in 18 U.S.C. § 3553(a) and then briefly recited each one. It noted that Estremera had

a substantial criminal history and that the offense had "all types of ramifications in our communities, our society, and in the world." It also characterized the offense as "very serious" and added that it was issuing the sentence to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct.

### C.  Pena

Pena, another member of the Latin Kings, met Corral in 1988. Between February 2002 and June 2002, Corral fronted Pena cocaine approximately once a month, in amounts totaling six to eight kilograms. Police recorded a number of phone calls in which Pena told Corral that he wanted to purchase cocaine. In one call, Pena asked Corral, who was driving at the time, if Corral could sell him a quarter kilogram of cocaine. When Corral replied that he could not, Pena asked Corral if any passengers in his car had cocaine to sell. Corral asked a friend in the car if he had any cocaine, but the friend said that he had none.

On July 24, 2002, police arrested Pena at 958 Oliver in Aurora, where, according to Corral, Pena lived with his girlfriend. FBI agents recovered a handgun inside a man's black jacket on a shelf in a first-floor closet, a police scanner, a scale, more than $10,000 in cash, and a gang ledger. According to Detective Jeff Wiencek of the Aurora Police Department, the ledger recorded the payment of the Latin King members' monthly dues and the gang's purchase of guns. Detective Wiencek conceded, however, that he did not know whether the ledger was created in furtherance of the conspiracy alleged in the indictment.

At sentencing, the district court found that Pena was responsible for more than 150 kilograms of cocaine be-

cause he knew that other people were involved with Corral in the distribution of drugs. The court said that the phone call in which Pena asked Corral if there was anyone else in the car who could sell him drugs demonstrated that "Pena knew that others were involved, others could be trusted, others were in the business of distributing drugs pursuant to the conspiracy." The district court found that Pena's base offense level was 38 and increased it by two levels for possession of a firearm. With a criminal history category of IV, Pena's Guidelines range was 360 months to life.

Pena argued for a sentence at the low end of the Guidelines range, asserting that he was a minimal participant in the conspiracy and that a thirty year sentence would be more than sufficient to accomplish the sentencing goals set out in § 3553(a). The district court rejected Pena's argument and sentenced him to life in prison on the conspiracy count and a concurrent 120 month sentence on the felon in possession count. The court emphasized the need to deter other gang members from dealing drugs.

### D. Bustamante

On October 23, 2002, police arrested Bustamante, transported him to the Aurora Police Department, and advised him of his *Miranda* rights. Bustamante invoked his right to remain silent and his right to counsel, and police asked him to sign a consent to search his vehicle. He signed the form, and when police searched the vehicle, they found drugs and a firearm.

Bustamante moved to suppress the evidence found during the search, but the district court denied the motion. On May 15, 2003, Bustamante entered a blind guilty plea. The district court sentenced him to a total of 123 months in prison.

## II.  Analysis

### A.  Liscano, Estremera, and Pena

Liscano, Estremera, and Pena argue that the government offered insufficient evidence to prove that they were part of a conspiracy to distribute drugs. They also argue, alternatively, that the government offered insufficient evidence to prove that they were part of the conspiracy alleged in the indictment and that a there was a fatal variance between the indictment and the proof at trial. *See United States v. Stigler*, 413 F.3d 588, 593 (7th Cir. 2005). The government responds that the evidence was sufficient to prove the conspiracy alleged in the indictment, and, at the very least, was sufficient to prove that the defendants conspired with Corral. Moreover, the government contends, any variance was harmless.

### 1.  Sufficiency of the Evidence

When reviewing the sufficiency of the evidence, the Court views the evidence in the light most favorable to the government and upholds the verdict if a jury reasonably could find the essential elements of the crime beyond a reasonable doubt. *See United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004). Put another way, the Court will reverse only if "the fact finder's take on the evidence was wholly irrational." *United States v. Hoogenboom*, 209 F.3d 665, 669 (7th Cir. 2000).

To prove a drug conspiracy, the government must show more than a series of spot sales because buying and selling drugs, without more, does not constitute a conspiracy. *See United States v. Thomas*, 284 F.3d 746, 752 (7th Cir. 2002). Rather, the government has to prove "an understanding—explicit or implicit—among co-conspirators to work together to commit the offense." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003). Factors indicat-

ing a drug conspiracy include transactions that involve large quantities of drugs, prolonged cooperation between parties, standardized dealings, a level of mutual trust, and sales on credit. *See United States v. Johnson*, 437 F.3d 665, 676 (7th Cir. 2006) (holding that the government offered sufficient evidence that the defendant conspired with a supplier where the defendant twice received distribution-size quantities of heroin on credit); *United States v. Medina*, 430 F.3d 869, 881-82 (7th Cir. 2005) (holding that the government offered sufficient evidence of a conspiracy where the defendants received large amounts of drugs from a dealer on credit); *United States v. Smith*, 393 F.3d 717, 720 (7th Cir. 2004) (holding that the government offered sufficient evidence of a conspiracy where the defendant received a large quantity of drugs on credit a single time and then, when the quantity of drugs was less than expected, offered to return to his supplier to obtain the correct amount).

In this case, the government offered sufficient evidence to prove that Liscano, Estremera, and Pena engaged in a conspiracy to distribute drugs. Corral fronted each of them large quantities of drugs on multiple occasions, so Corral's investment return depended on the defendants' success in reselling the drugs. The government offered little evidence of prolonged cooperation or standardized dealings, but that type of evidence—though relevant—is not necessary to sustain a conviction. As in *Johnson* and *Medina*, the jury reasonably could have found, given the large sales of drugs on credit, that the defendants agreed to help Corral ply his trade.[1]

---

[1] The defendants rely on *United States v. Thomas*, 284 F.3d 746, 751-52 (7th Cir. 2002), for the proposition that their relationship with Corral was nothing more than a buyer-seller relationship, but in *Thomas*, the defendant drug dealer never sold his drugs on credit.

### 2. Variance

Having resolved that the government's evidence was sufficient to prove that Liscano, Estremera, and Pena engaged in a drug conspiracy with Corral, the next question is whether there was evidence that they agreed to participate in the single, larger conspiracy alleged in the indictment. If not, then there was a variance between the indictment and the proof at trial. *See United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991). Even if there was a variance, however, it would not necessarily affect the validity of the defendants' convictions or sentences, because "a prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged." *United States v. Duff*, 76 F.3d 122, 126 (7th Cir. 1996). We will reverse only when a defendant is prejudiced by evidence that relates to other conspiracies or when the district court increases a defendant's sentence based on conduct unrelated to the conspiracy in which he participated. *See Townsend*, 924 F.2d at 1388-89.

In this case, the larger, single conspiracy was a "hub and spoke" conspiracy, an arrangement in which a core conspirator (in this case, Corral) moves from "spoke to spoke, directing the functions of the conspiracy." *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004). For a hub and spoke conspiracy to function as a single unit, a rim must connect the spokes together, for otherwise the conspiracy is not one but many. *Id.* In other words, for such a conspiracy to exist, "those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise." *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977); *see also United States v. Whaley*, 830 F.2d 1469, 1474 (7th Cir. 1987).

In *Townsend*, this Court found a variance between the proof and indictment of a drug conspiracy, where a drug

supplier, Diaz, conspired to distribute drugs with a man named Marquez. Diaz sold Marquez drugs on numerous occasions, but Diaz had no interest in what Marquez did with the drugs after he received them. Diaz knew that Marquez sold the drugs to other individuals and that Marquez purchased drugs from other suppliers, but Diaz did not further those endeavors. We held that Diaz conspired with Marquez, but not the others named in the indictment, stating, "[Diaz] knew that Marquez had extensive drug dealings beyond those in which he was involved . . . , but that knowledge alone did not make him a coconspirator with those involved in Marquez's other deals." *Townsend*, 924 F.2d at 1397. The Court made a similar point with respect to Diaz's supplier, Claudio. "Claudio obviously knew that Diaz was reselling the drugs in bulk, but the government presented no evidence indicating that he had any stake in the subsequent distribution of those drugs." *Id.* at 1398.[2]

In this case, there was no variance with respect to the proof against Liscano. The government offered two phone calls in which Liscano told Corral that he had seen law enforcement officers near Corral's residence. In one of those calls, Liscano told Corral to warn the other Latin Kings, including Estremera, about a possible raid. Given our extremely deferential review of the sufficiency of the evidence supporting a defendant's conviction, this evidence was enough to permit a reasonable jury to conclude that Liscano agreed to participate in the larger conspiracy. *See United States v. Munoz*, 957 F.2d 171, 174 (5th Cir. 1992) (holding that a defendant's warning

---

[2] The First Circuit, in an opinion authored by then-Judge Breyer, arrived at a similar conclusion in a case in which a defendant conspired to distribute hashish and knew about another conspiracy to distribute marijuana, but did nothing to further the marijuana conspiracy. *See United States v. Glenn*, 828 F.2d 855, 859 (1st Cir. 1987).

about the police is evidence of his participation in a conspiracy); *United States v. Sobamowo*, 892 F.2d 90, 94 (D.C. Cir. 1989) (same).

There also was no variance with respect to the proof against Estremera because the government offered evidence that he allowed Corral to use his garage to store drugs. Given this evidence, a jury reasonably could infer that Estremera agreed to help Corral sell drugs to all of the other spokes. *See United States v. Jenkins*, 78 F.3d 1283, 1287 (8th Cir. 1996) (upholding a conspiracy conviction where the defendant allowed co-conspirators to store drugs at his house and to use his car to transport drugs).

By contrast, the evidence against Pena was insufficient to prove that he participated in the hub and spoke conspiracy. The government contends that Pena knew the full extent of the conspiracy because he asked Corral if anyone in Corral's car could sell him drugs, but a defendant's knowledge of a conspiracy is not enough to prove that the defendant participated in it. *See Townsend*, 924 F.2d at 1397; *Glenn*, 828 F.2d at 859. The government also points to the ledger recovered at Pena's residence, but the government's expert, Detective Wiencek, testified that he could not say whether the ledger was created in furtherance of the conspiracy, that there was no evidence that the ledger recorded the conspiracy's cocaine sales, and that he could not tell when the ledger was created. In short, the ledger alone was not enough to prove that Pena furthered the larger conspiracy alleged in the indictment, meaning there was a variance between the indictment and the proof at trial.

### 3. Prejudice

A variance may prejudice a defendant at both trial and sentencing. *See Townsend*, 924 F.3d at 1388-89. An

allegation of a single, multiple-person conspiracy allows the government to try several defendants together and can prejudice a defendant if the jury hears incriminating evidence (also known as "spillover" evidence) that is admissible only against other defendants. *See United States v. Johnson-Dix*, 54 F.3d 1295, 1308 (7th Cir. 1995). In those circumstances, a jury might convict one defendant merely because he associated with the others. Alleging a single conspiracy also allows the government to make more liberal use of the co-conspirator exception to the hearsay rule. *See Townsend*, 924 F.3d at 1388 (citing Federal Rule of Evidence 801(d)(2)(E)). Finally, a variance can cause a defendant to be punished for acts committed by individuals with whom he did not conspire. *Id.* at 1389; *Glenn*, 828 F.2d at 860.

To determine whether a variance prejudiced a defendant at trial, the Court considers several factors:

> [the] (1) surprise to the defendant resulting from the variance, (2) possibility of subsequent prosecution for the same offense, (3) likelihood of jury confusion as measured by the number of conspirators charged and the number of separate conspiracies proven, and (4) likelihood of jury confusion in light of the instructions given the jury limiting or excluding the use of certain evidence not relating to the defendant.

*Townsend*, 924 F.2d at 1410-11. Pena contends that the variance in this case prejudiced him because the jury heard incriminating evidence that was relevant only against Liscano and Estremera. However, in *Townsend*, we rejected the same argument under a similar set of facts. The Court held that the defendant was not prejudiced by evidence relating to another defendant's case because the government offered recorded conversations in which the defendant discussed the distribution of illegal drugs. We said that the admission of prejudicial evidence was

harmless because "the jury had no need to look beyond each defendant's own words in order to convict." *Id.* at 1411. Here, as in *Townsend*, the government offered several recorded telephone conversations in which Pena arranged cocaine deals with Corral. For this reason, the evidence against him was strong enough to overcome any prejudice that may have resulted from the admission of evidence relevant only to other defendants.

The jury's drug quantity finding gives us some pause in light of the variance, because it may have based this finding—as it pertained to Pena—on cocaine sales in which Pena was not involved. However, the government offered evidence that Pena's conspiracy with Corral involved more than five kilograms of cocaine, and Pena did not object to the jury instructions at trial or on appeal. Therefore, Pena has forfeited any argument that the drug quantity finding prejudiced him.[3]

The main problem with the variance was that the district court held Pena accountable for 150 kilograms of cocaine, most of which was unrelated to his conspiracy with Corral. Section 1B1.3 of the Federal Sentencing Guidelines says that in the case of jointly undertaken criminal activity, a defendant's base offense level "shall be determined on the basis of . . . all reasonably forseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." As discussed above, the government's evidence was insufficient to prove that Pena furthered the larger conspiracy alleged in the indictment. Pena may have known that the larger conspiracy existed, but no reasonable fact finder could conclude that the government's evidence, in particular the ledger, proved

---

[3]  This finding increased Pena's maximum sentence from twenty years to life in prison. *Compare* 21 U.S.C. § 841(b)(1)(A)(ii), *with id.* § 841(b)(1)(C).

that Pena promoted the larger endeavor's success. Accordingly, the district court should have based Pena's offense level on the cocaine that he purchased from Corral—the only jointly undertaken criminal activity that the government proved.

### 4. Wiretap Evidence

Liscano, Estremera, and Pena next argue that the district court committed plain error when it allowed a witness to testify about the customary procedures used to obtain a telephone wiretap. Under the plain error standard, "the defendant has the burden of proving an error that is obvious and that affects substantial rights." *See United States v. Trice*, 484 F.3d 470, 473 (7th Cir. 2007). If the defendant makes such a showing, then the Court "may exercise its discretion to address the error, but only if the error affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* At trial, FBI Agent Michelle Sutphin testified that to obtain a wiretap, an agent must fill out an affidavit and have it approved by the Office of Enforcement Operations at the Department of Justice and the chief judge of the district court. She also testified that an agent must submit "ten-day reports" to the chief judge to prove that a tapped telephone is being used for criminal activity.

The three defendants maintain that Agent Sutphin's testimony unfairly bolstered the government's contention that the defendants were dealing drugs. In support of this argument, the defendants cite *United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006). In that case, a DEA agent testified about how the DEA obtains authorization for a wiretap, explaining that an agent fills out a "very extensive" affidavit outlining why there is probable cause to monitor a phone. The agent then discussed how the affidavit is reviewed by DEA headquarters, the local U.S.

Attorney's office, a panel of attorneys at the Attorney General's office in Washington, and then a district court judge. The defendant—whose phone had been tapped—objected to the testimony, but the district court overruled the objection. On appeal, this Court held that the testimony was improper and reversed the defendant's conviction. *Id.* at 713. We said that "[t]he government witness was improperly vouching for how good the evidence was." *Id.*

This case is distinguishable from *Cunningham*. Whereas in *Cunningham* the government offered testimony about the procedures it used to obtain a wiretap on the defendant's phone, here, the government offered testimony about the procedures it used to obtain a wiretap on Corral's phone. Therefore, unlike *Cunningham*, where the jury could have inferred from the improper evidence that *the defendant* was engaged in illegal activity before the wiretap, the primary inference that the jury could have drawn from Agent Sutphin's testimony was that *Corral* was engaged in illegal activity before the wiretap. That inference was not particularly damaging to the defendants' case because none of them denied that Corral was a drug dealer. Indeed, given the overwhelming evidence of Corral's illegal activity, it would have been pointless to argue otherwise. The error, if one occurred at all, did not affect the defendants' substantial rights.[4]

---

[4] Liscano, Estremera, and Pena also make a number of arguments to preserve them for appeal to the Supreme Court. They argue that in a conspiracy case, each defendant's drug quantity must be proved to a jury beyond a reasonable doubt, but the Supreme Court recently rejected an argument that only juries are entitled to find facts at sentencing. *Rita v. United States*, No. 06-5754, 2007 WL 1772146, *6, ___ S.Ct. ___ (June 21, 2007). Liscano also argues that he cannot be sentenced to life in prison

(continued...)

### B.  Pena

#### 1.  Firearms Conviction

Pena claims that the government offered insufficient evidence to convict him on the felon in possession count, insisting that there was no evidence that he lived at 958 Oliver, the address of the residence where the gun was found. He contends that his girlfriend lived at 958 Oliver and that she had a firearms license. We reject this argument. Possession of a firearm may be actual or constructive. *See United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006). "[D]efendants are in constructive possession [of a gun] if they have 'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *United States v. Thomas*, 321 F.3d 627, 636 (7th Cir. 2003) (quoting *United States v. Walls*, 225 F.3d 858, 864 (7th Cir. 2000)). The government can prove constructive possession of a gun by showing that police recovered the gun at the defendant's residence. *See United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995).

Though Pena contends otherwise, there was sufficient evidence that he lived at the Oliver Street address; Corral testified that Pena lived there, and FBI Agent Mary Speilman testified that Pena told her that he lived there. Additionally, no other male lived at 958 Oliver, and police found the gun wrapped inside of a man's jacket on a

---

<sup>4</sup> (...continued)

based on judicially determined drug convictions, but the Supreme Court rejected this argument in *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998). Finally, Pena argues that applying *United States v. Booker*, 543 U.S. 220 (2005) to his sentence violates the *ex post facto* clause of the Constitution. We rejected that argument in *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005).

shelf in a closet. Under *Kitchen*, this evidence was sufficient to support the jury's verdict.

### 2.   Double Counting

Pena next contends that the district court erred by punishing him twice for possessing a firearm. He maintains that the district court both increased his offense level (from 38 to 40) on the conspiracy count and sentenced him to 120 months on the felon in possession count because of the same conduct. We review the district court's interpretation of the Sentencing Guidelines de novo. *See United States v. Shearer*, 479 F.3d 478, 482 (7th Cir. 2007).

Section 2K2.1 of the Sentencing Guidelines sets out the possible punishments for a defendant, like Pena, who illegally possessed a firearm. Note 4 to § 2K2.4, then states:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under 1.3 (Relevant Conduct).

In other words, when a defendant is sentenced for the possession of a firearm under § 2K1.1, the district court cannot increase the defendant's sentence on another count for that same possession of a firearm. Despite § 2K2.4's prohibition on double counting, that is exactly what happened here. The district court increased Pena's offense level on the conspiracy count for possessing the

firearm found at 958 Oliver, and then it sentenced Pena to a concurrent 120 month sentence for possessing the same firearm. The district court could have done one or the other, but not both.

The government says that no double counting occurred because the conspiracy and felon in possession counts were grouped together. We disagree. Though Pena's presentence report suggested grouping the two counts together, the district court did not do so. When two counts are grouped together under § 3D1.1, there is one total offense level and, based on the resulting Guidelines range, one sentence for both counts. In this case, the district court handed out two separate sentences—life in prison on the conspiracy count and 120 months on the felon in possession count—and both sentences punished the same conduct, possession of a firearm by a felon. On remand, the district court may either increase Pena's offense level by two on the conspiracy count or sentence him separately on the firearms count, but it may not do both.

### C.  Estremera

#### 1.  404(b) Evidence

Next, Estremera contends that the district court erred by allowing the government to admit "prior bad acts" evidence, which is ordinarily inadmissible under Federal Rule of Evidence 404(b). The Court reviews the district court's admission of evidence for an abuse of discretion. *See United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002).

At trial, Estremera objected to the admission of a telephone conversation which suggested that Estremera bought drugs from someone outside the conspiracy. Estremera told Corral that he was going to "holler at somebody" but that he would check with Corral later to see

if Corral had obtained any drugs. Corral then provided the following testimony to clarify the conversation:

> Q: What was your understanding [about] what Mr. Estremera meant . . . when he said . . . that he was just checking up and he was on his way to holler at somebody, 'but hopefully you'll be straight, right?'
>
> A: Meaning he was checking with me first to see if I had any cocaine before he went and hollered at any of his other suppliers.
>
> Q: And what . . . was your understanding when he said: 'I say I'm gonna probably go holler at somebody, then?'
>
> A: Meaning that he was going to go holler at the other suppliers he has, that he can get cocaine from.
>
> Q: And what did you mean when you responded: 'You know, just to hold you off?'
>
> A: Meaning to go ahead and get cocaine off of someone else till I'm supplied.

Tr. Trans. at 765-66.

A statement is admissible under Rule 404(b) if it is made in furtherance of a conspiracy.[5] *See United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). Statements made to reassure a conspirator's loyalty to the conspiracy or to inform co-conspirators of the progress of the conspir-

---

[5]  Rule 404(b), in relevant part, provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

acy are made in furtherance of the conspiracy. *See United States v. Flores,* 63 F.3d 1342, 1377 (5th Cir. 1995); *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995). In this case, the district court reasonably concluded that the conversation between Estremera and Corral was in furtherance of the conspiracy because Estremera asked Corral's permission to buy drugs from someone else, demonstrating Estremera's loyalty to Corral as his primary drug supplier. Therefore, it did not abuse its discretion by admitting the evidence.

### 2. Reasonableness

Estremera next contends that his life sentence was unreasonable under the sentencing factors outlined in 18 U.S.C. § 3553(a). He maintains that the sentence was greater than necessary to comply with the goals of § 3553(a), that the district court did not evaluate sufficiently the § 3553(a) factors, and that the sentence was unfair in light of Corral's much lighter, fifteen-year sentence.

The Supreme Court recently approved this circuit's practice of presuming that a district court's Guidelines sentence is reasonable. *Rita v. United States*, No. 06-5754, 2007 WL 1772146, *6, ___ S.Ct. ___ (June 21, 2007). The Court said that an appellate court's non-binding presumption of reasonableness appropriately expresses the fact that a sentence is usually reasonable where a sentencing judge and the Sentencing Commission have reached the same conclusion about a proper sentence. *Id.* The Court also observed that a Guidelines sentence "likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)." *Id.* at *11. *Rita* left open the possibility, however, that the particular facts of a case— maybe a defendant's unusual history and characteristics

or the remarkable nature of an offense—might require a sentence outside the Guidelines.

The Court also discussed the sufficiency of a sentencing judge's stated reasons for issuing a particular sentence. The defendant in *Rita* had asked for a sentence below the applicable Guidelines range because, as a former government criminal justice employee, he maintained that he was susceptible to violence at the hands of other inmates. He also argued that his poor physical health and former military service merited a more lenient sentence. The government responded that the defendant's crime—perjury—had interfered with one of its investigations and that a former criminal justice employee should have known better.

After both sides presented their arguments, the sentencing judge said that the defendant's Guidelines range provided an appropriate sentence and that the public needed to be protected from the defendant's crime. Though the judge did not specifically mention the defendant's reasons for a lower sentence, the Supreme Court held that the statement was legally sufficient. It said that the district court heard the defendant's reasons for leniency and "simply found these circumstances insufficient to warrant a sentence lower than the Guidelines range." *Id.* at *13. It further explained that the judge could have stated explicitly that he had heard and considered the evidence and argument, that the Sentencing Guidelines reflected a proper sentence, and that the defendant's unique circumstances did not warrant a below-Guidelines sentence. Nevertheless, the Court said that the context of the judge's statements made clear the reasoning that supported its conclusion and allowed the Court to review that reasoning on appeal. *Id.*

Finally, the Court concluded that the defendant's sentence was reasonable, noting that the defendant offered

no evidence that he feared retaliation more than any other former law enforcement officer and did not argue that military veterans ordinarily should receive lower sentences. *Id.* at *14. In short, the Court found that the defendant's circumstances were not so remarkable to require a sentence outside the applicable Guidelines range.

With *Rita*'s framework in mind, it is clear that Estremera's Guidelines sentence was both reasonable and supported by sufficient reasons. Estremera's circumstances are not so different from other defendants convicted of distributing large amounts of drugs that a sentence outside the Guidelines was necessary. The district court reasonably could have concluded that Estremera's criminal record suggested an individual prone to recidivism and that his involvement in GED and Bible study classes was not significant enough to merit a lower sentence. Estremera's other argument—that his sentence was too severe in light of Corral's much lighter sentence— is one we repeatedly have rejected. *See, e.g., United States v. Duncan*, 479 F.3d 924, 929 (7th Cir. 2007).

The district court also supported the sentence with sufficient reasons. It recited each of the § 3553(a) factors and mentioned a few facts that weighed heavily in its decision, including the ramifications that drug selling has on our communities, Estremera's lengthy criminal history, and the seriousness of his offense. This explanation was substantially greater than the one approved in *Rita*, where the sentencing judge did not articulate any of the § 3553(a) factors and did not mention any facts that were important to his decision. Though Estremera's life sentence was stiff, the case was, like *Rita*, "conceptually simple" because Estremera did not make any compelling arguments for a sentence outside the Guidelines. As such, the district court's stated reasons have allowed us to engage in a meaningful review of Estremera's sentence.

### D. Bustamante

Bustamante argues that the district court should have granted his motion to suppress because police officers obtained consent to search his vehicle after they read him his *Miranda* rights and after he invoked his right to counsel. The Court previously has rejected this argument. *Miranda* and its progeny hold that "before police can initiate custodial interrogation of a defendant, they must advise the defendant of certain rights." *See United States v. Shlater*, 85 F.3d 1251, 1255-56 (7th Cir. 1996). Though all interrogation must cease once a defendant in custody has invoked his right to counsel, a request to search a vehicle or home is not likely to elicit an incriminating response and is therefore not interrogation. *See United States v. McClellan,* 165 F.3d 535, 544 (7th Cir. 1999); *Shlater*, 85 F.3d at 1256; *see also United States v. Stevens*, No. 05-41369, 2007 WL 1428594, n.3, ___ F.3d ___ (5th Cir. 2007) (collecting cases); Wayne R. LaFave, Jerold H. Israel, & Nancy J. King, Criminal Procedure § 3.10(b) (2d ed. 2007) (stating that a statement granting "consent to a search . . . is neither testimonial nor communicative in the Fifth Amendment sense.") (internal quotation omitted). Accordingly, *Miranda* does not protect a defendant who is in custody from a police officer's request to search his vehicle, and the district court correctly denied Bustamante's motion to suppress.[6]

---

[6] Bustamante contends that the Supreme Court's decision in *Dickerson v. United States*, 530 U.S. 428 (2000), implicitly overruled *Shlater* and *McClellan*, but that case did not address the meaning of "interrogation" for purposes of the Fifth Amendment. It simply held that *Miranda* warnings are constitutionally required and that Congress cannot overrule that requirement by statute. *Id.* at 444

### III.  Conclusion

The Court AFFIRMS Liscano's, Estremera's, and Pena's convictions and Liscano's and Estremera's sentences. The Court also AFFIRMS the district court's ruling on Bustamante's motion to suppress. The Court VACATES Pena's sentence and REMANDS for resentencing consistent with this opinion.

A true Copy:

     Teste:

                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*