In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3815

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FREDERIC S. HAYWOOD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 CR 1023-2 — **Ronald A. Guzmán**, *Judge.*

ARGUED NOVEMBER 18, 2014 — DECIDED JANUARY 26, 2015

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Fred Haywood, with help from others, processed bogus applications for mortgage loans and caused $1.4 million in losses to the lenders. He pleaded guilty to wire fraud, 18 U.S.C. § 1343, and was sentenced to 151 months' imprisonment. On appeal Haywood argues that part of the loss should have been excluded in calculating his offense level under the sentencing guidelines. Haywood explains that he disclosed part of his fraud during proffer

sessions protected by U.S.S.G. § 1B1.8. He also contends that the district court improperly applied a 4-level, aggravating-role adjustment under U.S.S.G. § 3B1.1(a). We affirm the judgment.

Haywood worked for several mortgage brokers between July 2001 and June 2007, and during that time he and at least 10 others (including his 5 codefendants) defrauded financial institutions that made loans to the brokerages' clients. As a "loan officer" or "loan processor" for his employers, Haywood was tasked with preparing loan applications and assembling supporting documents on behalf of home buyers needing financing. But many applications that Haywood prepared were chock-full of lies. He corroborated them with phony or altered documents, including property appraisals, cashier's checks (altered to make it appear that the buyers had made down payments), W-2 forms, pay stubs, and statements from landlords or property-management companies verifying that buyers who didn't already own a home were paying rent. Sometimes Haywood inflated the purchase price, causing the buyer to borrow more than necessary and allowing him to divert the excess to himself at closing. Sometimes the "buyers" themselves participated in the frauds, since they never intended to occupy the homes or repay the loans. Instead, they were being paid by Haywood to lend their names (and good credit) to secure fraudulent loans. Overall, Haywood admitted arranging 65 fraudulent loans.

Many of the phony rent verifications came from "New Christian Property Management," one of several shell companies incorporated by Haywood. (He used that company also to funnel loan proceeds to himself.) Codefendant Steve

Young, a fellow loan officer at one of the brokerages, created a variety of sham documents to meet Haywood's specifications. Codefendant Sumira Persuad supplied many of the inflated appraisals. Codefendant DeAngelo McMahan, another loan officer, helped gather documents for Haywood's loan applications. Haywood also paid at least five unindicted "bird dogs" to find "buyers" who would willingly apply for fraudulent loans.

In July 2007, before federal authorities had filed charges, an FBI special agent and three other federal agents interviewed Haywood (with his lawyer and a federal prosecutor present). Haywood admitted that at least 20 times from 2003 through 2005 he had given lenders false information about loan applicants' income, employment, and assets. But, as evidenced by the FBI agent's report of that interview, Haywood falsely denied much of his illegal activity, and apparently he did not share details about specific fraudulent loans. It was nearly 18 months later, in December 2008, that federal authorities charged Haywood. He executed a plea agreement and pleaded guilty to a single count of wire fraud in April 2012.

An FBI special agent discussed the case with the probation officer who prepared Haywood's presentence investigation report. That report reflects that the agent told the probation officer that Haywood had given truthful information during "two proffer interviews" conducted before he signed the plea agreement. In their plea agreement the parties stipulated that Haywood was responsible for 65 fraudulent loans (each one listed in "Attachment A" to the plea agreement) with a combined loss of $1,447,270. The plea agreement also states, in a section titled "Offense Level Calculation," that a

16-level increase would apply under U.S.S.G. § 2B1.1(b)(1)(I) "because the loss amount of $1,447,270 exceeds $1,000,000 but is less than $2,500,000." The plea agreement says nothing about the proffer interviews, about Haywood cooperating, or about U.S.S.G. § 1B1.8.

The probation officer relied entirely on the plea agreement in recommending that the loss amount used for guidelines purposes include the entire $1,447,270. In the presentence investigation report, the probation officer calculated a guidelines imprisonment range of 151 to 188 months, based on a total offense level of 29 and a criminal history category of VI. That offense level includes the 16-level increase under § 2B1.1(b)(1)(I) for a loss between $1 million and $2.5 million. The Level 29 also includes a 4-level increase under U.S.S.G. § 3B1.1(a), which applies to "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The probation officer reasoned that the scheme involved at least five participants, that Haywood was "culpable in all aspects," and that he served as an organizer exerting "a guiding influence over" the other participants.

Three days before sentencing, new counsel for Haywood filed—late—a sentencing memorandum. Counsel objected to the 16-level increase under § 2B1.1(b)(1)(I). According to counsel, "three deals involving 5121 S. Union, 2130 S. Trumbull, and 5721 S. Hermitage with a total loss value of $486,000" should be excluded from the guidelines loss because, counsel asserted, the government had first learned about those frauds "during various proffer sessions." Counsel insisted that the guidelines loss would be $917,000 after subtracting $486,000, which would lead to an upward ad-

justment of 14 levels, not 16, *see* U.S.S.G. § 2B1.1(b)(1)(H). In addition, counsel also objected that Haywood wasn't an organizer or leader and, thus, shouldn't receive a 4-level increase under § 3B1.1(a).

In Haywood's sentencing memorandum, defense counsel supplied no details about the objection to the probation officer's loss calculation, not even the dates or individual losses corresponding to the three addresses, all in Chicago. And, in fact, counsel's math does not add up. Subtracting $486,000 from the agreed total loss of $1,447,270 would leave $961,270, not $917,000. More importantly, Exhibit A to the plea agreement identifies five, not three, fraudulent loans involving these addresses: in November 2003 and December 2004 for S. Union, showing no loss for the first of the two loans and $47,500 for the second; in February 2004 and April 2005 for S. Trumbull, showing no loss for the first loan and $91,500 for the second; and in June 2007 for S. Hermitage, showing a loss of $284,750. These losses add up to $423,750, not $486,000, and subtracting $423,750 from $1,447,270 leaves $1,023,520, still above the $1 million threshold for a 16-level increase.

The government and probation officer didn't respond to Haywood's written objections. At the sentencing hearing, when defense counsel was asked about remaining objections to the presentence report, the lawyer raised the issue of the 4-level increase under § 3B1.1 but said nothing about the loss calculation or the corresponding 16-level increase under § 2B1.1(b)(1)(I). Counsel asserted that being a "loan officer" didn't "necessarily make" Haywood a supervisor of the other participants. The better view, counsel argued, was that the participants were "freelancers." The district court overruled

Haywood's objection to the 4-level increase, finding that he was an organizer and leader in an "extensive—I mean really extensive—fraudulent conspiracy."

Haywood, who is represented by new counsel on appeal, first argues that the district court miscalculated the guidelines loss by including the $486,000 purportedly attributable to the S. Union, S. Trumbull, and S. Hermitage "deals." Those losses, Haywood says, were shielded by U.S.S.G. § 1B1.8(a) from being used in calculating overall loss because he volunteered the fraud during proffer interviews. Haywood's new lawyer, though, simply has copied from previous counsel's sentencing memorandum without delving into the details or even checking the math. Like his predecessor, appellate counsel asserts that the losses from the three addresses add up to $486,000, which, as far as the record shows, is wrong. The correct figure, $423,750, is too small to whittle the stipulated loss, $1,447,270, below the $1 million needed for a 16-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(I). So even if the district court should have ignored all five of the fraudulent loans linked to these properties, the mistake was harmless.

Haywood also argues that the district court erred in finding him to be an organizer or leader and adding 4 offense levels under § 3B1.1 (indeed, Haywood insists, no increase was warranted). Haywood admits being an "active and even an enthusiastic participant in the mortgage fraud," but he continues to insist that his "co-defendants" were freelancers and not under his control. He did not control Richard Young, he says, and in fact learned from Young how to commit mortgage fraud. Moreover, Haywood adds, he participated in just one "deal" with DeAngelo McMahan, none

with Rita McKenzie, and never even met Carl McMahan. His brief says nothing about Sumira Persaud.

A 4-level increase is warranted under § 3B1.1(a) if the defendant participated in a criminal activity involving at least five participants (including himself) and organized or led at least one of the other participants. U.S.S.G. § 3B1.1 cmt. n.2; *United States v. Vasquez*, 673 F.3d 680, 685 (7th Cir. 2012); *United States v. Blaylock*, 413 F.3d 616, 621 (7th Cir. 2005); *United States v. Gerstein*, 104 F.3d 973, 979 (7th Cir. 1997). A "participant" need not be convicted or even charged. *See* U.S.S.G. § 3B1.1 cmt. n.1; *United States v. Knox*, 624 F.3d 865, 874 (7th Cir. 2010); *United States v. Boutte*, 13 F.3d 855, 860 (5th Cir. 1994). And contrary to what Haywood implies, a defendant can be an organizer or leader without knowing every participant. *United States v. Kamoga*, 177 F.3d 617, 622 (7th Cir. 1999). Relevant factors include the defendant's decision-making authority, whether he recruited accomplices, his planning and participation, the nature of the offense, and the amount of control he exerted over others. U.S.S.G. § 3B1.1 cmt. n.4; *United States v. Cooper*, 767 F.3d 721, 733 (7th Cir. 2014).

Haywood's contention that he wasn't an organizer or leader is preposterous. He admitted processing the applications for the 65 fraudulent mortgage loans listed in Exhibit A to the plea agreement. He told Young what phony documents he wanted and what specific information to include in those documents. He recruited Persaud and told her what valuations to use in her inflated appraisals. He instructed DeAngelo McMahan to bring particular documents to a loan closing and to fax him documents to prepare loans. And he recruited and paid at least five "bird dogs" to find "buyers"

for fraudulent loans. This was more than enough for the court to conclude that Haywood "had direction and control during the pertinent transactions over what the others did."

Accordingly, we affirm the judgment.