**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 7, 2019
Decided September 19, 2019

*Before*

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 18-3173

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 14 CR 539 |
| DIEGO PINEDA-SANCHEZ, *Defendant-Appellant*. | Andrea R. Wood, *Judge*. |

**O R D E R**

Diego Pineda-Sanchez pleaded guilty to conspiracy to commit money laundering, 18 U.S.C. § 1956(h), and admitted that his offense involved $1.2 million in drug proceeds. The district judge found, however, that Pineda-Sanchez was responsible for laundering more than $61 million in proceeds from the United States to Mexico—a sum that corresponded to a 22-level increase in offense level. *See* U.S.S.G. § 2B1.1(b)(1)(L). Based on several mitigating factors, the judge imposed a below-guidelines sentence of 180 months in prison. Pineda-Sanchez appeals his sentence and argues that the judge attributed the additional laundered funds to him based on unreliable evidence—the testimony of a cooperating coconspirator and the postarrest

interview of a codefendant. Because the judge's consideration of this evidence was not improper, we affirm.

## I. Background

Pineda-Sanchez led a conspiracy to launder drug proceeds from Mexican-based drug traffickers through the purchase and resale of gold. As set forth in his plea agreement, Pineda-Sanchez directed cartel members, including codefendant Carlos Parra-Pedroza, to collect and use drug proceeds to purchase scrap and fine gold from pawnshops and jewelers. They then shipped the gold to large refineries in Florida and California, and these refineries in turn wired the cash value to Parra-Pedroza and other coconspirators in Mexico.

Pineda-Sanchez admitted responsibility for laundering $1,183,520 in drug proceeds. This amount corresponds to a base offense level of 24. *See* U.S.S.G. §§ 2S1.1, 2B1.1(b)(1)(I). A two-level reduction for acceptance of responsibility would drop the offense level to 22, *see id.* § 3E1.1(a), which together with his criminal-history category of I would yield a guidelines range of 41 to 51 months. The government maintained, however, that the total value of the laundered funds was much, much higher— $100 million—a sum corresponding to a base offense level of 32, *see id.* §§ 2S1.1, 2B1.1(b)(1)(M), and a guidelines range exceeding the statutory maximum of 240 months in prison, *see* 18 U.S.C. § 1956(a).

The district court held an evidentiary hearing to determine the amount of laundered funds. A Homeland Security agent testified about his knowledge of the operation based in part on his communications with a cooperating witness and his participation in a codefendant's postarrest interview. The agent had watched coconspirator Juvenal Torres repeatedly drive to a residence in southwest Chicago, then to jewelry stores, and then back to the residence, leaving with several shipping boxes. Those boxes, the agent later discovered, were being sent to a gold-trading company in South Florida called Golden Opportunities. The government introduced records (obtained during the execution of an unrelated search warrant) showing that Golden Opportunities received more than $98 million in gold from "Shopping Silver," a fictitious company name used by Parra-Pedroza.

After a year of surveillance, agents conducted a traffic stop of Torres and found him with a large amount of drug proceeds. Some months later Torres was confronted with evidence about his money-laundering activities, and at this point he agreed to cooperate with the government. He described the operation, identified both Parra-

Pedroza and Pineda-Sanchez, and explained their roles in the scheme. Torres estimated that he had laundered $23 million as part of the operation.[1]  And to support the government's undercover investigation, he agreed to reestablish contact with Parra-Pedroza, resume his role in receiving drug proceeds, purchasing gold, and sending it to Golden Opportunities.

During the undercover investigation, Torres was directed by Pineda-Sanchez and Parra-Pedroza to collect and launder at least $2.4 million that did not go through Golden Opportunities. This sum included $1,484,789 that the government intercepted from couriers attempting to bring money to Torres; $588,787 that agents wired to a bank account at the direction of Pineda-Sanchez and Parra-Pedroza as part of the undercover operation; and $322,116 in gold that Torres sent to another refinery, Barba International.

Agents eventually arrested Parra-Pedroza and questioned him. He told the officers that Pineda-Sanchez had recruited him into the money-laundering conspiracy in either 2010 or 2011. Parra-Pedroza estimated his role in the laundering operation at $100 million. He said that he first laundered money for Pineda-Sanchez and another individual, with Pineda-Sanchez generating most of his business. After July 2012, however, he laundered money solely for Pineda-Sanchez. He also identified Pineda-Sanchez as the operation's main conduit to Mexican cartel members.

At sentencing the judge credited Parra-Pedroza's postarrest statements, which she deemed consistent with and corroborated by records and other testimony. She found that Pineda-Sanchez was responsible for laundering approximately $61 million in drug proceeds. In arriving at this figure, the judge first considered how much of the $98 million laundered through Golden Opportunities was attributable to Pineda-Sanchez. Based on Parra-Pedroza's statement that Pineda-Sanchez generated most of his business, the judge concluded that Pineda-Sanchez could be held accountable for 51% of the $81.3 million Golden Opportunities received from Shopping Silver prior to July 2012—about $41 million. Golden Opportunities also received $17.5 million from Shopping Silver after July 2012 when Parra-Pedroza worked exclusively with Pineda-

---

[1]  Torres testified at the evidentiary hearing that he pleaded guilty to laundering $23 million. He explained that in exchange for his cooperation, the government agreed to recommend a sentence 70% below the recommended guidelines range.

Sanchez. Finally, the judge added the $2.4 million unrelated to Golden Opportunities that Pineda-Sanchez and Parra-Pedroza had directed Torres to launder.

This $61 million figure correlated with a 22-level increase under the guidelines, *see* U.S.S.G. § 2B1.1(b)(1)(L), boosting the base offense level to 30, *see id.* § 2S1.1(a). The judge added another six levels because Pineda-Sanchez knew the laundered funds were the proceeds of a drug crime, *see id.* § 2S1.1(b)(1)(B), four levels for a leadership role, *see id.* § 3B1.1(a), and four levels for being in the business of laundering funds, *see id.* § 2S1.1(b)(2). She then subtracted two levels for acceptance of responsibility. *See id.* § 3E1.1(a). Based on the resulting offense level of 42 and a criminal history category of I, the guidelines range was the statutory maximum of 240 months in prison. *See* 18 U.S.C. § 1956(a). The judge then noted that there were "many" mitigating factors in Pineda-Sanchez's favor, including his guilty plea, his family's reliance on him for financial support, his lack of involvement in any violence or threats of violence, and the absence of any prior criminal history. She imposed a below guidelines sentence of 180 months.

## II. Discussion

On appeal Pineda-Sanchez challenges the district court's decision to hold him responsible for $61 million of laundered funds. He first questions the judge's decision to credit Torres's estimate that he laundered $23 million. This figure, he says, is unreliable both because it is "an exceedingly difficult mathematical estimate" and because Torres had an "obvious incentive to embellish the scope" of the money-laundering scheme to curry favor with the government.

But the accuracy of Torres's estimate is irrelevant because the judge did not rely on it to reach the $61 million figure. Rather, roughly $58 million of the $61 million estimate was based on records obtained during the execution of the search warrant at Golden Opportunities. And the remaining $2.4 million did not come from Torres's estimate either—$1.5 million was seized by the government; the remainder was sent to Barba International or wired to an international account.

To the extent Pineda-Sanchez contests the $2.4 million based on Torres's credibility, its inclusion in the $61 million calculation would not affect his guidelines range. Pineda-Sanchez was subject to a 22-level increase in his base offense level because the total amount of laundered funds was between $25 million and $65 million. *See* U.S.S.G. § 2B1.1(b)(1)(L). Whether he was responsible for $58 million or $61 million, his base offense level would remain the same. Thus, even if the judge should have

ignored the $2.4 million, any mistake would be harmless. *See United States v. Haywood*, 777 F.3d 430, 433 (7th Cir. 2015).

Pineda-Sanchez also contends that the judge's $61 million estimate is flawed because she based her calculations on Parra-Pedroza's unreliable postarrest statements. Those statements were not credible, he maintains, because the agent who testified about the interview did not speak Spanish—the language in which the interview was primarily conducted—and could not have known whether Parra-Pedroza was telling the truth. Pineda-Sanchez primarily relies on *United States v. Palmer*, 248 F.3d 569 (7th Cir. 2001), where we vacated the defendant's sentence because he pleaded guilty to possessing a small amount (4.7 grams) of crack yet was held accountable for more than 150 grams. *Id.* at 570–71. We took issue with the sentencing judge's reliance on testimony from a U.S. Marshal that a third party (unavailable to testify in court) had attributed 241 grams to the defendant. The judge noted that the particular transaction to which the marshal testified was over two years old and that the judge made no credibility finding regarding the one person who did have firsthand knowledge of the incident. *Id.* at 571.

The circumstances warranting reversal in *Palmer* are not present here. Unlike *Palmer* the judge here made an express credibility finding regarding the individual with firsthand knowledge. She explicitly said that she was crediting Parra-Pedroza's statements because they were consistent and corroborated by other evidence. Nor did the judge rely solely on the agent's account of the conversation; she stated that she reviewed all exhibits in the case, among them a video recording and transcript of Parra-Pedroza's interview. And to the extent the judge relied on the agent's characterization, his inability to speak Spanish is immaterial because a translator was present throughout the interview. Pineda-Sanchez has not challenged the accuracy of the translation.

Finally, Pineda-Sanchez contends that he lacked a meaningful opportunity to challenge Parra-Pedroza's account of events. But a judge may consider evidence at sentencing that would be inadmissible at trial, including hearsay. *See United States v. Ghiassi*, 729 F.3d 690, 695 (7th Cir. 2013). In any event, it would not matter that Pineda-Sanchez had no opportunity to challenge Parra-Pedroza because the Sixth Amendment's Confrontation Clause does not apply once guilt has been established. *Id.* at 695–96. And Parra-Pedroza's statements—corroborated by Torres's testimony, Pineda-Sanchez's plea agreement, seized records, and recorded phone calls—bore a

"sufficient indicia of reliability" for the judge to consider them. *United States v. Mays*, 593 F.3d 603, 608 (7th Cir. 2010).

AFFIRMED