In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 22-2060 & 22-2124

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER TATE and SANDRA KELLOGG,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cr-00096 — **Tanya Walton Pratt**, *Chief Judge.*

_____

ARGUED FEBRUARY 22, 2024 — DECIDED APRIL 3, 2024

_____

Before SYKES, *Chief Judge*, and RIPPLE and ST. EVE, *Circuit Judges*.

RIPPLE, *Circuit Judge.* The Government charged twelve people with conspiracy to distribute illegal drugs and other drug offenses. Ten of them pleaded guilty; Christopher Tate and Sandra Kellogg elected to go to trial. They were tried jointly, and the jury convicted them on all counts with which they were charged. The district court imposed substantial, yet below-guidelines, prison sentences. On appeal, Mr. Tate and

Ms. Kellogg each raise a challenge to the sufficiency of the evidence on one of the counts of their convictions. They each also raise a challenge to one of the enhancements used to determine their guidelines sentencing ranges. For the reasons stated in this opinion, we affirm the convictions and sentences of both defendants.

## I

## BACKGROUND

### A. Facts

Between the summer of 2019 and early 2020, Mr. Tate and Ms. Kellogg were part of a methamphetamine and heroin distribution cell based in Indianapolis. Darrell Stennis and Robert Hinton were the main suppliers. Mr. Tate bought from Stennis and Hinton and sold drugs to a variety of customers. Ms. Kellogg was one such customer. She bought methamphetamine from Mr. Tate and sold it to her own customers, all with the help of her boyfriend, Dwyatt Harris.

The Government presented evidence at trial of several of Mr. Tate's sales to Ms. Kellogg. In most of those sales, Ms. Kellogg coordinated the details with Mr. Tate and sent Harris to pick up the methamphetamine from Jovan Stewart, Mr. Tate's runner. Sometimes, however, Ms. Kellogg went to pick the drugs up herself. On January 16, 2020, for example, Ms. Kellogg and Harris went together to pick up an ounce of meth from Aaron Brown, who handed them the meth on Mr. Tate's behalf.[1] Ms. Kellogg and Harris then drove that ounce to a

---

[1] According to DEA surveillance of this transaction, Aaron Brown went into Harris's car, which was occupied by Ms. Kellogg and Harris, to drop off the ounce of meth. After Brown left Harris's car, Ms. Kellogg called Mr. Tate and asked if Brown was "the person that I left the phone in the

customer whose contact was saved in Ms. Kellogg's phone as "J." On February 7, 2020, Ms. Kellogg went alone to pick up the meth from Mr. Tate and spoke with Harris about delivering the meth to a person whose contact was saved in her phone as "Trish."

The larger drug distribution scheme started to unravel when, on February 20, 2020, Stennis was murdered. Before he was murdered, Stennis had been storing fifteen one-pound packages of meth at the house of his girlfriend, Tia Dimmett. Dimmett called Mr. Tate and asked for help selling the meth. Mr. Tate went over to Dimmett's house, took eight of the meth packages, and sold those eight packages. Meanwhile, Dimmett drove the seven other packages to her grandmother's house and put them in her grandmother's garage. Dimmett and Mr. Tate met up again at Dimmett's house, and the two of them, along with Stewart, drove back to Dimmett's grandmother's house. Mr. Tate met with a customer in front of the house and sold the customer two packages of meth.

Mr. Tate planned to sell the five remaining packages to two of his regular customers. Dimmett went into her grandmother's garage and retrieved a pillowcase containing the packages of meth and a gun. She then took the pillowcase out to the car and gave it to Mr. Tate. Mr. Tate removed the gun from the pillowcase and gave it to Dimmett, who stowed it under the driver's seat. Mr. Tate placed the pillowcase (which still contained the packages of meth) under the front passenger seat, where he was sitting. The three of them then drove

car that time." Trial Tr. V at 952; R.981-4 at 1. The Government suggested at trial that Ms. Kellogg's question indicated that she had previously interacted with Brown.

away from Dimmett's grandmother's house, planning to drop off Dimmett and sell the drugs to Mr. Tate's customers. Before they could do either, however, local police stopped their car. The officers found the gun and the meth in the car. They also found mail addressed to Mr. Tate and a vehicle order agreement for the car, with Mr. Tate's name on it.

Law enforcement later conducted searches of both Mr. Tate's and Ms. Kellogg's houses. At Mr. Tate's house, the DEA seized $3,000 in cash from the master bedroom and a loaded handgun from underneath the mattress of the guest room. At Ms. Kellogg's house, the DEA seized a handgun, a digital scale, Ms. Kellogg's cellphone, and about 11 ounces of meth, packaged in one-ounce bags. In a post-arrest interview, Ms. Kellogg said that the 11 ounces of meth in her home came from a pound of meth she had purchased within the past week.

**B. Prior Proceedings**

In March 2020, the Government filed an indictment charging Mr. Tate, Ms. Kellogg, Harris, and nine others with various drug offenses. Seven of these co-defendants then pleaded guilty. In the operative superseding indictment, filed in January 2021, the Government charged Mr. Tate, Ms. Kellogg, Harris, Stewart, and Hinton. Harris, Stewart, and Hinton pleaded guilty soon after that indictment was filed. Mr. Tate was charged with one count of conspiracy to distribute methamphetamine and heroin, in violation of 21 U.S.C. § 846; two counts of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and one count of possession of methamphetamine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Ms. Kellogg was charged with one count of conspiracy to distribute methamphetamine, in violation of 21

U.S.C. § 846, and one count of possession of methampheta-
mine with intent to distribute it, in violation of 21 U.S.C.
§ 841(a)(1).

The district court tried Mr. Tate and Ms. Kellogg jointly.
At the trial, the Government relied on cell-site location infor-
mation, text messages and recordings of phone calls inter-
cepted in wiretaps, the testimony of former co-conspirators,
the testimony of agents who conducted surveillance and exe-
cuted searches of the defendants' houses, and other evidence.
Neither Mr. Tate nor Ms. Kellogg presented evidence. After
the Government rested, Mr. Tate moved for a judgment of ac-
quittal on all counts, and Ms. Kellogg moved for a judgment
of acquittal on the conspiracy count. In support of Ms. Kel-
logg's motion for judgment of acquittal, counsel for Ms. Kel-
logg stated: "There may very well be a separate conspiracy
involving Ms. Kellogg and Mr. Harris, but that's not what
Count 1 is. Count 1 is a conspiracy with Tate."[2] The district
court denied both motions. After deliberations, the jury found
both Mr. Tate and Ms. Kellogg guilty on all of the counts with
which they were charged.

The district court sentenced Mr. Tate a few months later.
It determined his base offense level (38) based on offense con-
duct involving 4.5 kilograms or more of actual methamphet-
amine. It applied U.S.S.G. § 2D1.1(b)(1)'s 2-level firearm pos-
session enhancement, in part because "there was a firearm lo-
cated in his residence during the search … , which was in the
close proximity to large sums of cash."[3] It also applied both a
4-level enhancement for Mr. Tate's role as an organizer or

---

[2] Trial Tr. VI at 1238.

[3] Tate Sent. Tr. at 11.

leader of criminal activity that involved five or more partici-
pants and a 3-level enhancement for obstruction of justice.
The district court then explained that, although the sum of
Mr. Tate's base offense level and enhancements was 47, his
total offense level could be no higher than 43, the maximum
under the Guidelines. Because Mr. Tate's offense level was the
maximum under the Guidelines, the Guidelines recom-
mended life imprisonment. The district court sentenced him
to 400 months' imprisonment, to be followed by 10 years of
supervised release.

The district court sentenced Ms. Kellogg on the same day
that it sentenced Mr. Tate. It determined Ms. Kellogg's base
offense level (34) based on offense conduct involving 500
grams but less than 1.5 kilograms of actual methampheta-
mine. The district court applied U.S.S.G. § 2D1.1(b)(1)'s 2-
level firearm-possession enhancement. It also applied
§ 3B1.1(b)'s 3-level enhancement for Ms. Kellogg's role as a
manager or supervisor of criminal activity that involved five
or more participants. Based on Ms. Kellogg's total offense
level (39) and her criminal history (category III), the district
court calculated her guidelines range as 324 to 405 months.
The district court sentenced her to 288 months' imprisonment,
to be followed by 5 years of supervised release.

Mr. Tate and Ms. Kellogg appealed.

## II

## DISCUSSION

### A. Evidentiary Challenges to Convictions

Each of the defendants raises a sufficiency of the evidence
challenge to one of the counts on which they were convicted.
We will overturn a conviction for insufficient evidence only

if, viewing the evidence in the light most favorable to the government, "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. O'Leary*, 957 F.3d 731, 733 (7th Cir. 2020); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

**1.**

Mr. Tate challenges the sufficiency of the evidence supporting his conviction on the possession with intent to distribute count. The Government based its charge on that count on the five pounds of methamphetamine that the police discovered during the traffic stop. Those five pounds of meth were part of the fifteen pounds that Mr. Tate was helping Dimmett sell after Stennis's murder.

Mr. Tate contends that the Government did not prove beyond a reasonable doubt that he had possession of the drugs. Because possession can be sole or joint, *United States v. Lawrence*, 788 F.3d 234, 240 (7th Cir. 2015), the Government could have established its case by proving that Mr. Tate solely possessed the drugs or that he possessed them jointly with Dimmett. To possess drugs, one must have either "direct physical control," which establishes actual possession, or the "power and intention to exercise dominion and control," which establishes constructive possession. *United States v. Walls*, 225 F.3d 858, 864, 867 (7th Cir. 2000). Control in this context means "the perceived right among the criminals with whom he is interacting to deal, use, transport, or otherwise control what happens to the drugs." *United States v. Matthews*, 520 F.3d 806, 808 (7th Cir. 2008) (quoting *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001)).

The jury rationally could have found that Mr. Tate at least jointly possessed the methamphetamine found in his car. Before the stop, Dimmett had entrusted Mr. Tate to sell the meth, and Mr. Tate had arranged to sell the meth to two of his customers. He physically held a pillowcase that contained the meth, and the pillowcase was under his seat when the police stopped him in a car that he owned. Mr. Tate's conviction on the possession with intent to distribute count was supported by legally sufficient evidence.

**2.**

Ms. Kellogg challenges her conviction on the conspiracy count. In that count, the operative indictment charged that Ms. Kellogg, Mr. Tate, Harris, and two others "conspire[d] together and with other persons … to distribute controlled substances, in violation of [21 U.S.C.] § 841(a)(1)."[4]

Ms. Kellogg concedes that the Government proved that she conspired with Harris to distribute methamphetamine. But she contends that it was not sufficient to prove that she conspired with Harris. In her view, for the Government to sustain its conviction on the conspiracy count, it must have proved that she conspired as well with Mr. Tate. The reason, she submits, is that Mr. Tate, as the conspiracy's "hub," was her and Harris's only "link to … the larger conspiracy."[5] According to Ms. Kellogg, if the Government did not prove that she conspired with Mr. Tate, it "did not bring [her and Harris]

---

[4] R.514 at 1. The initial indictment had charged that Ms. Kellogg, Mr. Tate, Harris, and nine others so conspired.

[5] Kellogg Reply Br. 8.

within the larger conspiracy."[6] This failure to prove that she joined the larger conspiracy, she contends, requires that her conspiracy conviction be vacated.

*Berger v. United States*, 295 U.S. 78 (1935), is a good starting point for our evaluation of this contention. In that case, the indictment charged the defendant and three others with conspiring to pass counterfeit bank notes. *Id.* at 79–80. The evidence at trial, however, established not one overarching conspiracy, as was charged, but two distinct conspiracies. *Id.* at 80. The defendant conceded that he joined one of those smaller conspiracies but nonetheless moved for acquittal on the ground that "the evidence was insufficient to support the charge." *Id.* The Court explained that, "if the indictment charges a single conspiracy, and the effect of the proof is to split the conspiracy into two, the variance is fatal" only if it "substantially injured the defendant." *Id.* "The true inquiry," it continued, "is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Id.* at 82. The Court concluded that there was nothing in the record indicating that the defendant was prejudiced by the variance and accordingly declined to vacate his conviction on that ground. *Id.* at 83–84.

Later Supreme Court cases embrace the same approach. In *Kotteakos v. United States*, 328 U.S. 750 (1946), the Government charged one overarching conspiracy in the indictment but, at trial, it proved only a series of smaller sub-conspiracies. The Court recognized that, after *Berger*, this lack of proof of an overarching conspiracy was not dispositive. "The only question," the Court explained, was whether the defendants

---

[6] Kellogg Opening Br. 9.

"ha[d] suffered substantial prejudice from being convicted of a single general conspiracy by evidence which … proved not one conspiracy but some eight or more different ones." *Id.* at 752. The Court concluded that prejudice was "highly probable," in part because of the number of defendants (32) and distinct conspiracies involved (8 or more). *Id.* at 776. In *United States v. Miller*, 471 U.S. 130 (1985), the Government alleged in the indictment a certain scheme to commit mail fraud, but the proof at trial showed only a narrower and more limited, though included, scheme. *Id.* at 131. Relying on *Berger*, *Kotteakos*, and other cases, the Court affirmed the defendant's conviction, despite a "variance between the broad allegations in the indictment and the narrower proof at trial," because the defendant had not established prejudice resulting from the variance. *Id.* at 137.

In keeping with those cases, we have rejected the proposition that a conspiracy conviction must be vacated whenever the Government charges one overarching conspiracy in an indictment but does not prove such a conspiracy at trial. The Government, we have held, generally "may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged." *United States v. Cruse*, 805 F.3d 795, 804 (7th Cir. 2015) (quoting *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007)). Such a variance between a larger alleged conspiracy and a smaller proven conspiracy, we have explained, "only calls a guilty plea or verdict into question if it prejudiced the defendant." *Id.* In *United States v. Townsend*, 924 F.2d 1385 (7th Cir. 1991), the Government proved that four of the defendants joined smaller conspiracies to distribute drugs, but it failed to "establish that [those defendants] agreed to join the single, ongoing conspiracy … charged in the indictment." *Id.* at 1410. The court

nonetheless affirmed those four defendants' convictions because they had not established prejudice from the variance. *Id.* at 1416. Similarly, in *United States v. Hopper*, 934 F.3d 740 (7th Cir. 2019), the defendant sought vacatur of his conviction on account of a "variance between the indictment (alleging a single, overarching conspiracy) and the proof at trial (showing, at most, smaller sub-conspiracies)." *Id.* at 758. We concluded that, even if the defendant had established such a variance, his claim failed because he had not established prejudice. *Id.* at 759.

Ms. Kellogg's argument mirrors the arguments advanced in cases like *Berger*, *Kotteakos*, *Townsend*, and *Hopper*. She concedes that she joined a conspiracy but seeks reversal because, in her view, the Government failed to prove that she joined the larger conspiracy alleged in the indictment. Although she does not use the word "variance" in her briefing, her grievance is with a supposed variance between the larger conspiracy charged in the indictment and the smaller conspiracy proven at trial. *See United States v. Duff*, 76 F.3d 122, 126 (7th Cir. 1996) ("A defendant who maintains that the evidence shows a conspiracy different from the one charged in the indictment is arguing that there is a variance between pleading and proof."). Like the defendants in *Berger*, *Kotteakos*, *Townsend*, and *Hopper*, then, she must establish not only that no rational juror could have found an overarching conspiracy but also that she suffered prejudice from the supposed variance.

We need not determine whether a rational juror could have found one conspiracy connecting Ms. Kellogg, Harris, Mr. Tate, and the others, because even if a juror could not have found such a conspiracy, Ms. Kellogg has not established prejudice. She does not contend, for instance, that the

supposed variance caused "prejudice to [her] ability to defend [herself] at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Miller*, 471 U.S. at 138 n.5. The only way in which Ms. Kellogg contends the variance prejudiced her was through the counting of Mr. Tate and others as participants for purposes of U.S.S.G. § 3B1.1(b)'s manager-supervisor enhancement. Any issue with the district court's application of that enhancement, however, would at most require resentencing, rather than vacatur of her conviction on the conspiracy count. *See Bustamante*, 493 F.3d at 888, 893 (affirming conviction but remanding for resentencing where a variance between a larger charged conspiracy and smaller proven conspiracy affected only the defendant's sentence). Ms. Kellogg's conviction on the conspiracy count, like Mr. Tate's conviction on the possession with intent to distribute count, must be affirmed.

## B. Challenges to Sentencing Enhancements

Mr. Tate and Ms. Kellogg each also raise a challenge to a sentencing enhancement that the district court used in determining their guidelines ranges. "To determine whether a Guidelines enhancement was correctly imposed, we review the district court's legal conclusions de novo and its factual findings for clear error." *United States v. Ihediwa*, 66 F.4th 1079, 1082 (7th Cir. 2023).

### 1.

Mr. Tate challenges the district court's use of U.S.S.G. § 2D1.1(b)(1)'s 2-level firearm-possession enhancement, which applies if "a dangerous weapon (including a firearm) was possessed" during a drug trafficking offense. As the district court noted, the DEA found a gun under a mattress in

Mr. Tate's house, near $3,000 in cash. That alone was sufficient to support a finding of constructive possession. *See, e.g., United States v. Webster*, 775 F.3d 897, 906 (7th Cir. 2015) (noting that evidence of a residence's connection to a drug business can help to support a finding that the defendant constructively possessed a gun found there); *United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000) (concluding that evidence that the defendant exercised control over a bedroom where a gun and drugs were found was sufficient to establish constructive possession of the gun).

Moreover, even if the district court had erred in employing the enhancement, the error would have been harmless. With or without the enhancement, Mr. Tate's total offense level would have been 43, the maximum under the Guidelines. *See* U.S.S.G. ch. 5, pt. A (sentencing table); *id*. cmt. n.2 ("An offense level of more than 43 is to be treated as an offense level of 43."). The enhancement therefore had no impact on Mr. Tate's guidelines range or on his substantial rights. *See United States v. Farmer*, 38 F.4th 591, 606 (7th Cir. 2022) (concluding that any error in the application of an enhancement was harmless because the defendant's offense level would have been 43 with or without the enhancement); *United States v. Thomas*, 897 F.3d 807, 817 (7th Cir. 2018) (same).

**2.**

Ms. Kellogg challenges the district court's use of § 3B1.1(b)'s 3-level enhancement. That enhancement applies if the defendant was a "manager or supervisor" of one or more participants in criminal activity and "the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).

Ms. Kellogg first contends that she was not a "manager or supervisor." In support, she states that she was not "ordering around Harris" and suggests that her requests that Harris pick up or deliver drugs constituted no more than one-off requests between equals.[7] Although "some hierarchy among those involved in the criminal activity must exist" for the enhancement to apply, *United States v. Weaver*, 716 F.3d 439, 444 (7th Cir. 2013), the Government need not show that the defendant was "ordering around" another participant to establish this hierarchy. Instead, in certain cases we have found it sufficient that the defendant was "[o]rchestrating or coordinating activities performed by others," *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008), or "delegat[ing] delivery or payment tasks" in connection with drug transactions. *United States v. Sainz-Preciado*, 566 F.3d 708, 714 (7th Cir. 2009).

Further, Ms. Kellogg's characterization of her requests that Harris pick up and drop off drugs as one-off requests between equals is at odds with the evidence from trial. At trial, the Government showed that Ms. Kellogg sent Harris text messages such as: "Just call me when you're ready, they waiting on you"; "You ready to meet my people or no?"; "He know you on your way"; "Trish just called. … Bring three just in case."[8] Sometimes, Ms. Kellogg sent Harris an address, without more. The district court was permitted to infer from those messages that Ms. Kellogg was in charge and that Harris was, as both the Government and counsel for Ms. Kellogg put it at trial, Ms. Kellogg's "runner."[9] There was no clear

---

[7] Kellogg Opening Br. 10.

[8] Trial Tr. V at 895, 938, 939, 997.

[9] Trial Tr. I at 31; Trial Tr. VI at 1239.

error in the district court's finding that Ms. Kellogg managed or supervised Harris.

Ms. Kellogg next contends that the criminal activity did not involve five or more participants. In Ms. Kellogg's view, Mr. Tate and the others cannot be "participants" because they did not conspire with her and Harris. This court, however, does not "require[] that a party be a co-conspirator to qualify as a … participant under § 3B1.1(b) when the underlying offense was conspiracy." *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996). Instead, all that is required is that the party be "criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1, cmt. 1. This certainly includes parties who could be held criminally responsible as principals (co-conspirators and accomplices),[10] but it also includes parties

---

[10] We have held that the defendant also counts as a participant. *United States v. Haywood*, 777 F.3d 430, 433 (7th Cir. 2015); *United States v. Zaragoza*, 123 F.3d 472, 484 (7th Cir. 1997). The other circuits that have addressed this question have reached the same conclusion. *See United States v. George*, 841 F.3d 55, 69 (1st Cir. 2016); *United States v. Paccione*, 202 F.3d 622, 625 (2d Cir. 2000); *United States v. Colletti*, 984 F.2d 1339, 1346 (3d Cir. 1992); *United States v. Cabrera-Beltran*, 660 F.3d 742, 756 (4th Cir. 2011); *United States v. Dickerson*, 909 F.3d 118, 127–28 (5th Cir. 2018); *United States v. Bennett*, 291 F.3d 888, 897–98 (6th Cir. 2002); *United States v. Morelos*, 544 F.3d 916, 920 (8th Cir. 2008); *United States v. Walter-Eze*, 869 F.3d 891, 914 (9th Cir. 2017); *United States v. Hardwell*, 80 F.3d 1471, 1496 (10th Cir. 1996); *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994).

Several considerations support this conclusion. First, the language of the Guideline "does not in any way distinguish the defendant subject to the enhancement from the other individuals involved in the criminal scheme." *Paccione*, 202 F.3d at 625. Second, the defendant necessarily fits within the commentary's definition of a participant as "a person who is criminally responsible for the commission of the offense." § 3B1.1 cmt. 1. Third, the commentary refers to a defendant's actions with respect to "other participants" or "another participant," § 3B1.1 cmt. 2, which

who could be held "criminally responsible under principles of accessory liability." *Hall*, 101 F.3d at 1178; *see United States v. Zuno*, 731 F.3d 718, 723 (7th Cir. 2013) (noting that a person counts as a participant if he or she "'could have been charged,' even if only as an accessory") (emphasis removed). The Government, then, can establish that a person was a "participant" in the same way it would establish that the person was an accessory: with evidence that the person gave "knowing aid in some part of the enterprise." *United States v. Millet*, 510 F.3d 668, 697 (7th Cir. 2007) (quoting *Hall*, 101 F.3d at 1178).[11]

There was sufficient evidence in the record to support the district court's finding that there were five or more participants, given that standard. Ms. Kellogg herself was a participant, *see Haywood*, 777 F.3d at 433, as was Harris, her co-conspirator. *See Hall*, 101 F.3d at 1178. Mr. Tate, Stewart, and Brown all count as participants, too. Each of them helped to provide Ms. Kellogg and Harris with distribution-level quantities of drugs, which Ms. Kellogg and Harris then sold to others. Mr. Tate arranged at least five sales of meth to Ms. Kellogg and Harris; Stewart acted as Mr. Tate's runner for at least three of those sales, and Brown acted as Mr. Tate's runner for at least one. Each of the three of them, then, provided

---

underscores that the defendant should be considered a participant. *See Paccione*, 202 F.3d at 625. Fourth, a related Guideline calls for a reduction in the defendant's offense level if the defendant was a "minimal participant" or "minor participant," § 3B1.2, which again underscores that the defendant is to be considered a participant.

[11] *See United States v. Pabey*, 664 F.3d 1084, 1097 (7th Cir. 2011) (stating that workers were "likely" participants under U.S.S.G. § 3B1.1 because some of the evidence indicated "they knew the work was illegal and they helped advance the scheme anyway").

knowing assistance to Ms. Kellogg and Harris's conspiracy. *See United States v. Pearson*, 113 F.3d 758, 762 (7th Cir. 1997) (concluding that a defendant who delivered distribution-level amounts of drugs to two others on numerous occasions could be liable on a theory that he aided and abetted their conspiracy).

Ms. Kellogg finally contends that, even if the record evidence could have supported the district court's finding regarding the number of participants, the district court did not adequately explain its finding. Ms. Kellogg is correct that the district court's finding was cursory: it simply stated that "the criminal activity, the Tate conspiracy, involved five or more participants."[12] The district court did not identify the individuals it deemed to be participants.

The main problem with this contention is that Ms. Kellogg did not raise it in the district court. A failure to raise an objection to a sentencing enhancement in the district court can be fatal. *See, e.g., United States v. Zarnes*, 33 F.3d 1454, 1475 (7th Cir. 1994). We have held that a challenge to the adequacy of a district court's sentencing findings might be preserved despite a lack of contemporaneous objection "when a defendant consistently disputes an issue, and the district court does not specifically elicit objections to the adequacy of the findings." *United States v. Ortiz*, 431 F.3d 1035, 1039 (7th Cir. 2005).[13]

---

[12] Kellogg Sent. Tr. 22.

[13] *See United States v. Patel*, 131 F.3d 1195, 1201 (7th Cir. 1997) (objections to adequacy of findings supporting enhancements were preserved despite the defendant's failure to object in the district court because the defendant "consistently disputed" the underlying guidelines issues in a "lengthy sentencing hearing").

Here, however, Ms. Kellogg stated only very briefly in a written objection to the presentence report that the conspiracy involved less than five people. She did not mention the issue at all at the sentencing hearing, although the parties and the court discussed at length the related issue of whether she managed or supervised Harris. Given the lack of discussion of the number-of-participants issue, the district court understandably did not focus on that issue when stating its findings.

In another case, we might treat this matter as merely forfeited (thus reviewable for plain error), rather than waived (not entitled to any review). *See, e.g.*, *Zarnes*, 33 F.3d at 1475. But Ms. Kellogg did not raise the argument in her briefing either; instead, she raised it for the first time at oral argument, which itself constitutes waiver. *See United States v. Bell*, 585 F.3d 1045, 1055 n.1 (7th Cir. 2009) ("[A]rguments raised for the first time in oral argument … are waived."). Ms. Kellogg's objection to the adequacy of the district court's findings on the number-of-participants issue is accordingly waived. The district court's employment of the manager-supervisor enhancement did not constitute reversible error.

## Conclusion

For the reasons stated, the convictions and sentences of both Mr. Tate and Ms. Kellogg are affirmed.

AFFIRMED